343 P.2d 697

**Inez D. ALSPAUGH, Claimant-Appellee,**

**v.**

**MOUNTAIN STATES MUTUAL CASUALTY CO., Insurer-Appellant.**

No. 6448.

Supreme Court of New Mexico.

July 10, 1959.

Rehearing Denied Sept. 16, 1959.

W. C. Whatley, Las Cruces, for appellant.

Bigbee & Stephenson, Santiago E. Campos, Santa Fe, for appellee.

CARMODY, Justice.

This is an action for workmen's compensation benefits. The claimant is the widow of Sidney G. Alspaugh, who allegedly died as a result of a heart attack arising out of and in the course of his employment by the New Mexico State Highway Department.

The insurer denied liability, and on the issues framed, the cause was tried to a jury. The jury found for claimant; judgment was entered accordingly, and the insurer seeks a review of the judgment by this appeal.

Appellant first contends there was a failure on the part of the workman, and the claimant as well, to give written notice to the employer of the accidental injury pursuant to the provisions of § 59-10-13, 1953 Comp. The contention is not well taken. The question of notice was not raised in the trial court and since failure to give notice does not present a jurisdictional question, Clower v. Grossman, 1951, 55 N.M. 546, 237 P.2d 353, the question cannot be raised here for the first time. State ex rel. Bliss v. Potter Co., 1957, 63 N.M. 101, 314 P.2d 390. *Notice* and *claim* are not synonymous. It is to be observed, however, that at the close of claimant's case, appellant, by motion for an instructed verdict, questioned the timeliness of the

claim for compensation. In this respect, the workman died July 30, 1956, and the claim (complaint) for compensation was filed by his widow July 25, 1957; hence, the claim was timely filed under the provisions of § 59–10–13.

The final point urged challenges the sufficiency of the evidence. Summarizing the evidence, the workman was employed by the State Highway Department in November 1953 as an engineer. He was the project engineer on an interurban project at Alamogordo in 1955, and later on a project at Holloman Air Force Base. Prior thereto, he had enjoyed good health although he suffered from hypertension and had been discharged from military service in World War II by reason of such ailment and received a pension. About December 7, 1955, he suffered a heart attack while employed at Alamogordo. There is no question but what the work in which he was engaged, requiring general supervision of the work, was of a type which would require him to work under stress and strain and perhaps make him nervously upset. He had to spend long hours, and even Saturdays and Sundays, in order to complete the project on schedule, and as the Alamogordo project neared completion he appeared to be in an alarming condition, according to his wife.

Following the heart attack in December, he apparently suffered a second heart attack in April 1956, and within a few days therafter was unable to work at all. His wife took him to the Veterans Hospital in Albuquerque where he remained for more than a month, but did not appear to make any improvement and was moved to St. Joseph's Hospital in Albuquerque. After remaining there for about a week, his wife took him to her home in Oklahoma where he was hospitalized for a few days and then transferred to the Veterans Hospital in Oklahoma City where he died on July 30, 1956, at the age of forty-nine years.

The death certificate, which is the only definite evidence of the immediate cause of death, stated that the same was: "Hypertensive Arteriosclerotic Heart Disease Generalized" and other significant conditions contributing to death, "Cerebral Atrophy." Certain of the above words need be defined, as follows:

*Hypertensive:* "Characterized by increased blood pressure."

*Arteriosclerosis:* "Thickening of the walls of arteries, occurring mostly during old age. There is usually inflammation or degeneration of the arterial walls."

*Generalize:* "To make general as a disease."

Gould's Medical Dictionary, Scott, Second Edition; Medical Dictionary for Lawyers, Malloy.

Two doctors testified on behalf of the claimant, one of whom saw the deceased

in Alamogordo at the time of his first attack. The other cared for him while he was in St. Joseph's Hospital in Albuquerque from June 11th until June 19, 1956. Both of these doctors testified generally with respect to the cause and effect of heart attacks and the effect of a prior condition of hypertension thereon. These same doctors also testified, in effect, that the deceased might have suffered a heart attack from the conditions of his employment and that the heart attack might have been the cause of death, and also pointed out that when a person has a heart attack, it is not unusual for the person to have another, and that about one-third of the people who experience heart attacks succumb to the first one, another one-third to the second attack, and usually the balance to the third attack. However, neither of these doctors attended or saw the deceased within six weeks of his death, and beyond the foregoing expressed no opinion other than possibilities as to the cause of his death. Nothing further appears in the record supporting the claimant's theory of the cause of death beyond the death certificate mentioned heretofore. As indicated, we do not understand the language of the certificate to indicate death resulted from a heart attack or accident suffered some three months or more previously, or from complications resulting therefrom.

During the lifetime of the decedent, he gave no notice and made no claim for ben-efits under the Workmen's Compensation Act, although he did submit claims to the Occidental Life Insurance Company through the Highway Department under a general group accident and sickness policy. These claims, over the signature of the deceased, stated that the disability was *not* due to claimant's occupation. So also the two doctors who cared for him during this period and who testified, certified to the Occidental Life Insurance Company that the injury or sickness did not arise out of his occupation.

Subsequent to the death, the claimant in this case obtained a widow's pension from the United States government and also claimed and received a death benefit under the Occidental group policy.

It would appear to be well settled law in New Mexico that "it is not necessary that a workman be subjected to an unusual or extraordinary condition, not usual to his employment, for an injury sustained to be termed an accidental one under our law." Sanchez v. Board of County Commissioners, 1957, 63 N.M. 85, 313 P.2d 1055, 1058; Gilbert v. E. B. Law & Son, Inc., 1955, 60 N.M. 101, 287 P.2d 992; Webb v. New Mexico Pub. Co., 1943, 47 N.M. 279, 141 P.2d 333, 148 A.L.R. 1002.

Be that as it may, the essential question here is whether there was a causal relationship established between the

accident and the injury and between the injury and death.

While recognizing that an accidental death may result from exertion in the performance of the normal activities of one's labor, yet to give it that character there must appear in the evidence some proof rising above the rank of mere surmise or speculation that such exertion was put forth, with particularity as to time, place and circumstance. The relation between the effort and the proof of its result must be positive, direct, immediate and easily identifiable, and not of a kind that can be found in the normal progress of every coronary involvement. Under the facts in Teal v. Potash Co. of America, 1956, 60 N.M. 409, 292 P.2d 99, 102, and in Sanchez v. Board of County Commissioners, supra, there was sufficient evidence of causal relation between the work done and the heart attack together with almost immediate death to support the award of compensation. However, the difficulty in this case lies in the lack of an evidentiary showing of causal relationship between the injury (the heart attack) and the subsequent death more than three months later.

This court in Teal v. Potash Co. of America, supra, and in Sanchez v. Board of County Commissioners, supra, found, in effect, that the proximity in the time of death to the accident was sufficiently close to justify recovery. In the Sanchez case, there was competent medical evidence explaining the cause of death. In the Teal case, however, common experience and knowledge were substituted for medical evidence under the facts and circumstances there present. In the Teal case, the court stated as follows:

"But where, as here, there is a sequence of events in rapid order, such a brief hiatus of time between the exertion, followed by the quenching of thirst with refrigerated water and, then, sudden death, the natural experience of mankind suggests there likely is a causal connection between the strain and exhaustion, on the one hand, and the consequent death on the other."

In the instant case, this sequence does not exist, and the "natural experience of mankind" does not "suggest the presence of a causal connection" where more than three months elapsed between the second heart attack and the decedent's demise. There was no medical testimony of a causal connection, and certainly if the medical experts were unable to so testify, it is not within the province of the court to assume such a causal connection, nor may the court permit the jury so to do.

In White v. Valley Land Co., 1957, 64 N.M. 9, 322 P.2d 707, we held by a divided court that it was proper to submit to the jury the question of the determina-

tion of a causal connection between trauma received in employment and subsequent death by cancer. A careful reading of the White case will disclose that the court clearly affirms the rules concerning proof of causal relation, and points out that where there is an injury and death follows "shortly thereafter" the jury, in a case where cancer was the cause of death, and its medical nature not too well known, may pass upon all the facts in evidence and determine the causal connection. We are of the opinion that the decision in the White case should be confined to facts such as were there present, and should not be applied in "heart" cases such as this where there must either be a showing, as in Teal and Sanchez, supra, of the death "shortly thereafter" or that, in order for compensation to be allowed for unexplained death, there must be more than mere proof of a heart attack some months previously and the opinion of a doctor that the heart attack might have been a contributing cause. The burden of proof was on the claimant to show that the death resulted from the accidental injury. Decedent died while in a hospital, and certainly it is not unreasonable to require the claimant to produce proof of the causal connection, if such connection existed. Were it otherwise, claims by reason of the death of a workman, even years after an initial heart attack, would be well nigh limitless. After all, when a person's heart stops he dies, and this is a fact of which general cognizance may be taken. However, the mere fact that a man dies sometime after having suffered one, two or even more heart attacks does not *of itself* mean that this was the cause of death. It is well known that many persons who have suffered heart attacks live out their normal life span and subsequently die of a completely unrelated cause. We do not say that this is what occurred here, but in the absence of proof we are not able to say what was the cause of death without engaging in conjecture and speculation.

One very recent case from New Jersey, which sustained an award in a heart case where the deceased died ten days after his disablement from an acute myocardial infarction suffered in the course of his employment, contains an extremely able discussion of the type of proof necessary in a case such as this. Ciuba v. Irvington Varnish & Insulator Co., 1958, 27 N.J. 127, 141 A.2d 761, 767, wherein the Supreme Court said:

"In its nature, an exertion-induced injury may be difficult to prove when it involves coronary occlusion, myocarditis or dilatation of the heart. But the issue, after all, as in other civil cases, is whether the burden of proof

has been sustained. 'Reasonable probability' is the standard of persuasion, that is to say, evidence in quality sufficient to generate belief that the tendered hypothesis is in all human likelihood the fact. Does the evidence reasonably give rise to a circumstantial inference of the requisite causal relation? Circumstantial or presumptive evidence, as a basis for deductive reasoning in the determination of civil issues, is defined as 'a mere preponderance of probabilities, and, therefore, a sufficient basis for decision.' (Citation). It need not have the attribute of certainty, but it must be a presumption well founded in reason and logic; mere guess or conjecture is not a substitute for legal proof. The determinative inquiry is whether the evidence demonstrates the offered hypothesis as a rational inference, that is to say, a presumption grounded in a preponderance of the probabilities according to the common experience of mankind. The accepted standard of persuasion is that the determination be probably based on truth. A bare quantitative preponderance is not enough. The evidence must be such in quality as to lead a reasonably cautious mind to the given conclusion. The measure of the weight of the evidence is 'the feeling of probability which it engenders.' (Citation)."

1 Larson's Workmen's Compensation Law 516, § 38, et seq., particularly § 38.83, gives a very illuminating discussion of the problems involved in the "heart" cases and a rather detailed analysis of the New Jersey and New York cases.

If the evidentiary facts in the instant case will support a finding of accidental death suffered in the course of one's employment, it is difficult to conceive of any case in which the same would not be issuable where a workman with a heart ailment suffered injury or death. We do not feel the Workmen's Compensation Act was ever intended to give to workmen that protection claimed here, amounting in fact to insurance. The judgment is based upon supposition, conjecture and guesswork, and cannot be sustained. Stambaugh v. Hayes, 1940, 44 N.M. 443, 103 P.2d 640; and Campbell v. Schwers-Campbell, Inc., 1955, 59 N.M. 385, 285 P.2d 497.

In view of our determination, it follows that there was error on the part of the trial judge to allow this case to go to the jury, and the motion for a directed verdict by the appellant should have been sustained.

The cause will be reversed and remanded with directions to set aside the verdict and dismiss the cause. It is so ordered.

LUJAN, C. J., and McGHEE and MOISE, JJ., concur.

COMPTON, Justice (dissenting).

I would affirm the judgment. The majority opinion says there was medical evidence to the effect that the workman suffered two heart attacks resulting from his work, but denies recovery on the ground there was no proof of causal relationship between the injuries and the death. I believe claimant's account of his last seizure, standing alone, establishes causation, or at least presents a question for the trier of the facts. She testified as follows:

"Well, he had been out on the job and he came home and I saw him standing—staggering up to the trailer and I started out to help him, and he said, 'take me to the doctor', he said 'I have an awful pain' and he grabbed his chest and he was doing his hand like this (indicating) and he said 'I'll have to change my clothes' and he said 'Oh, my goodness, I've got to get a doctor, quickly' * * *. And he was bent over a chair like this (indicating) and he turned purple. That is the only color I can say * * *. He turned dark and he was gasping and clutching his chest."

The majority says that the death certificate is the only definite evidence of the immediate cause of death. Quite the contrary; to so hold would exclude reasonable inferences to be drawn from the evidence. The certificate was signed by one who knew nothing about his previous attacks. His attending physicians, however, as I appraise their testimony, treat the injury and death as cause and effect. Dr. Baumgardner testified that the workman had suffered "permanent damage to the heart" as a result of the first attack. He further testified that it was natural that subsequent heart attacks would follow the initial one when the heart muscles had been thus damaged.

Dr. Dettweiler saw the workman in June, 1956, following the second attack. He also testified that he had sustained heart damage. Then there appear the following questions propounded to Dr. Dettweiler and his answers thereto:

"Q. Now, under the situation which I have outlined to you, up to this point, which I won't repeat in detail, could it be—would it be an expectancy that Mr. Alspaugh would finally die *as a result of the first and second heart attacks?* A. Yes. The statisticians fairly well show that approximately a third of the people survive their first attack and approximately another third

of the remaining survive their second attack; and the other third do not survive their third. Those are rough statistics. They are not accurate, but fairly close.

"Q. And after a person had suffered two heart attacks of the type which have been described, the expectancy would be that he would ultimately die *as a result of it,* wouldn't that be true? A. Well, he would be a very good candidate, *yes.*" (Emphasis ours.)

The workman had the first attack in December, 1955, the second in April, 1956. He lingered until July 30, 1956. And there is no proof that he had a third attack as the opinion seems to suggest. In such circumstances, the trier of the facts could very logically infer that death resulted from the attacks.

If the majority opinion is to become the law in this jurisdiction, I sense an end to recovery in "heart cases" unless death occurs to the workman while engaged on the job or immediately thereafter, or unless there is positive medical evidence produced to support the claim; yet, we know medical evidence, as valuable as it may be, is not indispensable in such cases. The majority seems to completely overlook the medical evidence and the testimony of Mrs. Alspaugh, or at least reappraises it.

Believing an erroneous conclusion has been announced, I dissent.