378 P.2d 119

Clara D. **LITTLE**, dependent widow of Irving
E. Little, deceased, claimant,
Plaintiff-Appellee,

v.

**J. KORBER & CO.**, Employer, and U. S.
Fidelity & Guaranty Co., insurer,
Defendants-Appellants.

No. 6992.

Supreme Court of New Mexico.

Jan. 21, 1963.

Keleher & McLeod Russell Moore, Albuquerque, for appellants.

Smith, Kiker & Kitts, Richard E. Ransom, Albuquerque, for appellee.

CHAVEZ, Justice.

This appeal is from a judgment in favor of plaintiff-appellee, the dependent widow of Irving E. Little, deceased, on her claim filed under the Workmen's Compensation Act. The case was tried by the district court of Bernalillo County, without a jury.

Irving E. Little, age 59, had been employed by J. Korber & Co., a hardware con-

cern in Albuquerque, for some fifteen years as manager of the wholesale department. His duties entailed buying and selling merchandise, keeping three outside salesmen supplied with goods, and supervising the catalogue operations, as well as supervising retail sales.

On June 5, 1959, between the hours of 8:00 and 9:00 a. m., Mr. Little came to the office of Edward H. Bierman, the office manager, "storming and was quite upset" because one of the clerks had made an error in a charge ticket. Bierman told Little not to become concerned, that he, Bierman, was busy and that Little should make the correction and forget it. On this occasion Little tore open the package containing charge tickets and took them all to his office, including the erroneous charge ticket. Little corrected the erroneous charge ticket and, within fifteen minutes, he returned to Bierman's office. According to Bierman, Little "seemed to be perfectly all right after that. I didn't pay too much attention." Little left Bierman's office and was not seen by Bierman after that until Bierman was called out and informed that Little had fainted. At approximately 10:20 a. m., Little died, at or near his desk, of a myocardial infarction due to arteriosclerotic heart disease which was due to a generalized arteriosclerosis.

The hardware store in which Little worked was on a three-story level, although there was no merchandise on the third floor. Between the floors there were steps or stairs. Little frequently walked up and down the stairs between the main and mezzanine floors, carrying cumbersome bundles of plastic pipe which weighed from 15 to 20 pounds. The stairs between the ground and mezzanine floors consisted of twelve steps and were approximately twelve feet in total height.

Bierman testified: That during the last six or eight months of Little's life he observed Little limping and that he complained of pain in his leg; that in the two-week period preceding Little's death, Bierman saw Little coming down the steps very slowly, carrying plastic pipe from the mezzanine floor; that on occasion Little appeared to have trouble negotiating these steps, even when not carrying pipe; that Little would hold onto his side and walk with a slight limp; that Little limped more often when he was emotionally upset. Bierman further testified: That Little "would go along and be very even tempered and then all of a sudden why he would get into some of these explosive moods" and "shake with anger and become very visibly upset;" that this occurred more frequently during the last two years of Little's life; and that Little worried quite a bit about his work and often complained about sales.

During the last two or three months of his life, Little was much more tired when he

came home from his work at night. He had not had a vacation for three years prior to his death. Upon his return from the last vacation, he and Mrs. Little both worked evenings at the store for three weeks to catch up on work that had not been attended to during his two weeks' vacation. In his work Little would become greatly concerned over small incidents and was subject to apparent fits of temper. Complaints of irritability and excitability were frequently made by other personnel at the store.

Appellants' only contention is that the trial court's finding, that the death of claimant's decedent was caused by an accident arising out of and in the course of his employment, is not supported by substantial evidence.

The trial court made the following findings:

"3. That between the hours of 8:00 and 9:00 A.M., on June 5, 1959, Little, in the course of his employment, became emotionally upset and as a result thereof died at approximately 10:00 A.M., of a myocardial infarction due to arterio-sclerotic heart disease.

"4. That Little suffered an accident arising out of and in the course of his employment, which was the cause of his death."

Mr. Little's medical history discloses that for some twelve years preceding his death he had undergone numerous examinations at the Lovelace Clinic in Albuquerque, during which he complained of unusual fatigue, shortness of breath on exertion, pain in his left shoulder of several days' duration, "internal nervousness, especially when under pressure," pain in the left arm, pain over the heart following exertion, and pain in both legs with exercise. When examined in 1942, he complained of pain in the left shoulder and Dr. Streeper, a heart specialist, did not feel that the pains were due to a heart condition. Electrocardiograms taken in 1947, 1951, 1952 and 1953, were thought to be moderately abnormal but did not show any specific change during this time and were not felt to represent a heart condition of a severity to recommend any great change in his activities. In 1952 Little reported that he had a lot of tension on his job; that he felt pretty good in the morning until noon, but in the afternoon he felt very tired, listless, and had trouble in thinking and in doing other things. In 1954 Little complained of pain over the heart following exertion, which radiated into the arms. In 1956 Little complained of pain in both legs with exercise. Little noticed this especially with fast walking, the pain which developed being of such severity he would have to stop. After a period of rest the pain would be relieved and he would be able to continue. He had trouble going up-

stairs. At this time a diagnosis of arterial insufficiency due to arteriosclerosis plus spasm of the arteries in the lower extremities was made. In 1957 an operation was performed which improved circulation in the right leg and foot. Little was operated on for a recurrent hernia on April 9, 1959, and an inguinal herniorrhaphy was performed. During hospitalization, Little complained of pains in the chest and on April 21, 1959, an esophagoscopy was performed without positive findings. This was the last time Little was examined by the Clinic before his death at 10:20 a. m. on June 5, 1959.

An autopsy was performed on Little to determine the cause of death. A summary of the autopsy findings as written by Dr. Thomas Chiffelle, a pathologist, follows:

"This case is predominantly illustrative of the effects of far advanced generalized arteriosclerosis with especial involvement of the coronary arterial system. Nearly all segments of the major coronary system have undergone extreme fibrous intimal thickening with calcification and reduction of the vessel lumen to a small fraction of its normal diameter. In two places (one in the right coronary artery and one in the left coronary artery) there are zones of fresh intramural hemorrhage within large plaques which have resulted in further narrowing of the lumen on these vessels. Physiologically, the cardiac status has been recently in beginning decompensation, as a result of the impaired coronary circulation, such that secondary effects are found (a) in the lungs where hemosiderin laden histiocytes have accumulated ('heart failure' cells), and (b) in the liver which morphologically exhibits the picture of chronic congestion with early central atrophy and focal necrosis. In such a precarious state of coronary circulation and nourishment, as exhibited in this case, the further narrowing of the vessel lumen, by intramural hemorrhage, would readily precipitate a terminal crisis of acute cardiac failure. At sometime in the past, the patient has suffered a severe myocardial infarct (from occlusion of the right coronary artery) resulting in extensive scarring of the posterior wall of the left ventricle of the heart."

Dr. Chiffelle also testified as follows:

"Q. And will you state to the Court whether or not, when you performed that autopsy, you found this man had had for sometime a very serious heart condition?

"A. He did.

\*     \*     \*     \*     \*     \*

"Q. Well, is stress recognized medically, doctor, as a precipitating factor in causing death in an already afflicted sclerotic patient?

"A. I think it depends on the conditions that exist prior to the point where the stress is applied.

"Q. Well, my question is, is stress recognized, doctor?

"A. Yes.

\*     \*     \*     \*     \*     \*

"MR. McLEOD: I will reframe the question, Doctor, from your autopsy that you performed what would be your medical opinion as to that man's days upon this earth, short, long or what?

\*     \*     \*     \*     \*     \*

"A. Short."

In approaching the problem before us we must adhere to the ruling of this court as announced in Luna v. Flores, 64 N.M. 312, 328 P.2d 82:

"\* \* \* Where a case is tried by the court without a jury, the court is the sole judge of credibility of witnesses and weight to be given their testimony. \* \* \*

"It has long been the rule that in determining whether evidence is sufficient to sustain the trial court's findings of fact, this court on appeal will consider only that evidence and inferences to be drawn therefrom which support the findings, and we will not consider any evidence unfavorable to the findings. The findings of the trial court will not be disturbed when they are supported by any substantial evidence and this court will not weigh the evidence where conflicts exist. \* \* \*"

■ We are also bound by the rule that findings of the trial court based on conflicting evidence are conclusive on appeal. Parks v. McIntosh, 68 N.M. 324, 361 P.2d 949.

■■ We are not unmindful of what we said in Alspaugh v. Mountain States Mutual Casualty Co., 66 N.M. 126, 343 P.2d 697, that in cases of this type the evidence must rise above the rank of mere surmise or speculation; and our often repeated rule that the Workmen's Compensation Act does not make the employer an insurer of the employee against injury or death occurring during his hours of employment. Teal v. Potash Company of America, 60 N.M. 409, 292 P.2d 99. See also Salazar v. County of Bernalillo, 69 N.M. 464, 368 P.2d 141.

We have also considered our holdings in Sanchez v. Board of County Commissioners, 63 N.M. 85, 313 P.2d 1055, and Christensen v. Dysart, 42 N.M. 107, 76 P.2d 1.

Although there may be a conflict in the evidence as to causal connection between the accidental injury and the death of Mr. Little, there is positive evidence by Dr. J. H. Dettweiler, claimant's medical expert, who, in reply to a hypothetical question which reviewed the prior history of Mr.

Little and summarized the testimony including the findings of the pathologist who performed the autopsy upon Mr. Little, testified as follows:

"A.  Well, we do know that a person with arteriosclerotic heart disease and who has a temper such as described in this question certainly in a fit of anger is one of the causal factors that precipitates an attack of coronary occlusion of this nature and being as the time relationship is such, it would be my opinion that there was a direct causal relationship between his fit of anger and his terminal heart attack."

Dr. Dettweiler further testified:

"Q.  Do I understand your testimony then to be, doctor, that an incident of anger was, in your opinion, the competent producing cause of this man's death at the time that it occurred?

"A.  That is my opinion, yes.

\*   \*   \*   \*   \*   \*

"Q.  Well, is it a medically accepted fact, doctor, that a person with a diseased heart and the blood vessel condition, which this man apparently had, is more or less susceptible to severe damage by strain or stress, even slight, than a well person?

"A.  This is true.

\*   \*   \*   \*   \*   \*

"MR. SMITH: Well, now doctor, with reference to physical or mental strain, are they both—is the result of both the same to a person with severe heart and generalized arteriosclerosis?

"A.  In general this is true.

"Q.  Whether it is lifting or whether it is anger, frustration, disappointment, the result is the same as the physical stress, is that correct?

"A.  Well, both increase the demands of the heart and this is, as far as known, certainly the effect of the precipitous—the lack of adequate blood supply to the heart, which is in this case and cases exactly like this terminates fatally.

"Q.  Well, is it necessary, doctor, for a person to die on the spot following one of these incidents of emotional upset in order for it to be casually related to or be the proximate cause of the death?

"A.  No, this, of course, depends on what type of mechanism this sets off, if it sets off a mechanism of heart failure, which terminates with, say, super-imposed pneumonia, this may take some days. If it causes a complete heart arrest or cardiac standstill, then the

death is immediate or if it causes one of the other mechanisms by ventricular flow disorder or some ventricular cardiac or some abnormal rhythm of the heart, then this may take anywhere from a few hours, maybe even another day or two.

\*    \*    \*    ,    \*    \*    \*

"Q. In this case do you place any great weight on the sequence of events, that is, the death within two hours following the emotional upset?

"A. Yes, I think this is most important.

\*    \*    \*    \*    \*    \*

"Q. One question, Your Honor, and I will hold it to one. Basing your answer, doctor, upon your studying and your experience and the facts as related to you in the hypothetical question here, plus the findings in the autopsy which have been received in evidence, do you have an opinion as to the immediate cause of Mr. Little's death?

\*    \*    \*    \*    \*    \*

"A. It is my opinion that there is a causal relationship because the anger and excitement represents an adequate cause of a stress reaction that, in my opinion, triggered off the chain of events that terminated fatally in this man within an hour and a half or two hours."

Dr. Oliver S. Cramer, an expert in internal medicine, testified:

"MR. SMITH: Assume, doctor, that the man went to work between 8:00 and 8:30 in the morning, that sometime between 8:30 and 9:00 o'clock he became visibly emotionally disturbed about a particular charge account that was one of his functions to handle, that he called attention rather forcibly to the so-called great error, which he considered it to be, to the auditor or bookkeeper, that at that time he was physically disturbed, now what effect would that have upon him or upon his blood circulation, would the heart muscle itself during that episode call for any increased blood supply or what would be the effect physiologically?

\*    \*    \*    \*    \*    \*

"A. I think that the—that it is speculation in regards to him but in a certain number of cases, a hundred such cases or so that there are certain things that may result.

"MR. SMITH: Now, doctor, let's confine ourselves to this particular patient knowing as you did at the time of autopsy that he did have generalized

arteriosclerosis, that he did have an old myocardial infarction, that he did have a right bundle block, what effect would it have whether it is Mr. Little or any other individual?

\*   \*   \*   \*   \*   \*

"A.   The things that you mentioned probably don't enter into it too forcibly.   All of these things make the heart somewhat more susceptible to strain from speeding up the rate of the heart.   The fact that his coronary arteries themselves were quite badly involved with arteriosclerosis in themselves, regardless of anything else, makes them perhaps somewhat more susceptible to changes as a result of the heart speeding up.

"Q.   Well, that, doctor, is partially what I wanted to know and then what effect does an episode of anger or emotional disturbance have on such an individual?

\*   \*   \*   \*   \*   \*

"A.   Its primary and immediate effect is to speed up the heart.

"Q.   Is it a strain on the heart?

"A.   It is a strain on a diseased heart such as this, it depends on how much it is speeded up, how much strain, this I don't know.

"Q.   Well, excuse me, doctor, isn't it a medically accepted fact that the more disease the heart, the more disease the arteries, the less strain that is required to cause fatality or complete disability?

"A.   Yes, I would think it was.

"Q.   So that now, doctor, you know the condition of Mr. Little at least from autopsy and will you tell us what effect an incident of anger would have on his blood circulation, would the heart require more blood at that particular time?

\*   \*   \*   \*   \*   \*

"A.   The heart speeds up, the muscles of the heart work harder, when they work harder they need more oxygen.   To the normal heart to supply more oxygen the coronary arteries dilate and deliver more blood.   In the case where there is hardening of the arteries it is difficult for these coronary arteries to dilate or they are unable to dilate, they cannot deliver more blood to the heart muscle.

\*   \*   \*   \*   \*   \*

"MR. SMITH:  I will be glad to rephrase it.   Doctor, in an incident of stress upon a person with already seriously diseased arteries, that is sclerotic, is there any danger created by

such an incident of emotional upset or anger to that individual?

\* \* \* \* \* \*

"A. Well, I think there is danger in anything that speeds up the heart which includes the emotions.

\* \* \* \* \* \*

"Q. Now, doctor, at the time that your deposition was taken the question was asked you about this particular incident as to whether or not you had a medical opinion as to whether the particular incident, with the qualifications that Mr. McLeod has insisted be placed in the question, that is the incident of emotional disturbance or stress, had upon this individual whether or not it would have been the triggering or precipitating cause, do you now have an opinion?

\* \* \* \* \* \*

"A. I think that it may have been a triggering cause.

"Q. A contributing cause of death?

"A. It may have been.

\* \* \* \* \* \*

"Q. Well, is it a fact, doctor, that emotional stress may be as seriously damaging as physical stress?

\* \* \* \* \* \*

"A. I presume that it may affect the heart as much as physical stress.

\* \* \* \* \* \*

"MR. SMITH: Well, doctor, if a result is such that the symptoms cause the results to that inferior circulation and damaged heart, it may have a fatal result, may it not?

\* \* \* \* \* \*

"A. I think it has been thought that people with this type of heart disease may die as a result of severe emotional stress."

Dr. Donald Huelsmann, a witness for defendants, testified:

"Q. Now basing your opinion on your medical experience and what you found in the case summary and what you heard in the hypothetical question, leaving out the fact that there was no evidence of any blood clot in the leg, state whether or not, in your opinion, that any excitement or emotion which might have been suffered by Mr. Little would have been the cause, the precipitating cause of his heart attack?

\* \* \* \* \* \*

"A. I feel that if he had suffered his heart attack within a few moments of his emotional upset, either immediately or a few min-

utes thereafter that I would consider it a precipitating factor. The fact that he was able to continue with his work for approximately an hour and a half would make me feel that the heart attack due to the hemorrhages in the erythema of the coronary arteries, the walls of the arteries was purely a coincidence.

\*   \*   \*   \*   \*   \*

"MR. SMITH: Do you state to the Court, doctor, that in order to establish a causal relationship between an attack of stress, either physical or mental, the death must be immediate?

"A. No, the symptoms.

"Q. Well, what, then, is your opinion?

"A. The symptoms should be immediate. In this particular type of case, every case is different, in this case there was no clot or thrombosis. If he had had a small hemorrhage that partially occluded a blood vessel and then a clot built up over a period of hours and occluded the blood vessel and then we would possibly say that the hemorrhage occurred at the time of his stress but there was no evidence in the autopsy that that was the cause

of the occlusion. It was a hemorrhage in the lining of the coronary artery that caused the occlusion and there was no clot over it, therefore, my feeling is that the hemorrhage, if it were going to be casually related to the stress, would have to occur at the time of the stress and not an hour and a half later.

\*   \*   \*   \*   \*   \*

"Q. Now doctor, Dr. Cramer, as I understand it, had no information as to the presence or absence of symptoms immediately following the episode of anger, yet he stated that it was his considered opinion as Mr. McLeod has recited it to you and as I have, also, that in his opinion it may have been a contributing cause.

\*   \*   \*   .\*   \*   \*

"A. Well, his answer is similar to mine, he said, may, and I said, yes, if and no, if.

\*   \*   \*   \*   \*   \*

"Q. Well, doctor, do you believe that and is this generally accepted by the medical profession that anger or fear may be a precipitating cause of heart attacks, either disabling or fatal?

"A. I agree it may be.

**304**

"Q. But in this particular case you rule it out because of the sequence of events, you feel that in order for a causal relationship to exist, he must have died within an hour?

"A. No, I don't say that he must have died within an hour, he should have developed symptoms. He may have recovered from his heart attack even if he had had one immediately, he doesn't have to die but he should have had symptoms within a few moments.

\* \* \* \* \* \*

"Q. And what is your impression of that?

"A. He had very severe arteriosclerosis of his coronary arteries with evidence of a previous heart attack sometime in the past and a recent narrowing of both the right and left coronary arteries from hemorrhages into the lining of the artery.

"Q. And would emotional stress then, doctor, have a more serious effect on him?

"A. Emotional stress could have brought that on but it would have brought it on within a few moments."

The record also discloses that, regardless of any claimed conflict in the testimony of the medical experts, they are in agreement generally in their opinions that an emotional upset results in stress upon the heart as much as physical stress, and that anger may be a precipitating cause of heart attacks, either disabling or fatal. There is also testimony that a person such as Mr. Little, who was suffering from advanced generalized arteriosclerosis of the coronary arterial system, would be more affected by severe stress than one who had no arteriosclerosis.

Thus, after a painstaking review of the record, it is our considered judgment that the evidence meets the requirements of substantiation and we hold that the evidence in this case establishes a causal relationship and that Mr. Little, in the course of his employment, became emotionally upset, suffered an accidental injury, and as a result thereof died of a myocardial infarction due to arteriosclerotic heart disease.

Appellee is awarded the sum of $750 as attorneys' fees for services rendered on this appeal.

The judgment of the district court is affirmed.

It is so ordered.

COMPTON, C. J., and MOISE, J., concur.

CARMODY and NOBLE, JJ., not participating.