743 P.2d 118

**Emma OLIVER, Plaintiff-Appellee,**

v.

**CITY OF ALBUQUERQUE, Employer and Insurer, Defendant-Appellant.**

**No. 9018.**

Court of Appeals of New Mexico.

Nov. 25, 1986.

Thomas E. Jones, Thomas E. Jones, J.D., Ltd., Albuquerque, for plaintiff-appellee.

David N. Whitham, Asst. City Atty., Albuquerque, for defendant-appellant.

## OPINION

BIVINS, Judge.

The City of Albuquerque (City), a self-insurer under the Workmen's Compensation Act, appeals from a judgment awarding lump-sum death and other benefits to the widow of a city fireman who died of a heart condition while on the job. The parties' major arguments address whether or not plaintiff established a causal connection between the worker's heart attack and job-induced stress. We hold she did not and reverse. In view of this holding, we do not reach the remaining issues.

The issue of causation between the heart attack and job stress necessarily raises the question of whether the heart attack arose out of decedent's employment. The answer to this issue also requires reversal.

Charles Oliver, a lieutenant with the Albuquerque Fire Department, reported to work at approximately 6:00 p.m. on December 17, 1980. He and his company moved from Station House 10 to Station House 4 for standby duty while the company at Station House 4 responded to a two-alarm tanker fire. Standby duty meant Lt. Oliver and his company were subject to call for

backup at the two-alarm fire in progress or to respond to any other fire within the area. During the evening, Lt. Oliver and the other firemen ate popcorn, ordered hamburgers, talked, watched television and retired sometime around midnight. Shortly after Company 4 returned around 5:30 a.m. on December 18, 1980, a fellow fireman attempted to awaken Lt. Oliver; he was dead. An autopsy revealed that Lt. Oliver died of atherosclerotic heart disease with total occlusion of the left anterior descending coronary artery 6.0 centimeters from its origin with a second partial occlusion (80% to 90%) of the same artery at a different location. Additionally, the circumflex artery was occluded 70% to 80% and the right coronary artery was 60% to 70% occluded.

NMSA 1978, Section 52–1–28(B) provides: In all cases where the defendants deny that an alleged disability is a natural and direct result of the accident, the workman must establish that causal connection as a medical probability by expert medical testimony. No award of compensation shall be based on speculation or on expert testimony that as a medical possibility the causal connection exists.

The City denied causation; therefore, it was incumbent on plaintiff to establish a causal connection between Lt. Oliver's death and job-induced stress as a medical probability by medical expert testimony. *Renfro v. San Juan Hospital, Inc.*, 75 N.M. 235, 403 P.2d 681 (1965); *Chaffins v. Jelco, Inc.*, 82 N.M. 666, 486 P.2d 75 (Ct. App.1971).

Plaintiff's expert, Dr. Hall, a family practitioner, testified in response to a hypothetical question, as follows:

Counsel: Doctor, I want to ask you a hypothetical question and it's as follows. Dr. Hall I am going to ask you this question based on certain facts which we are going to state are true and you are allowed to consider them as true to be able to answer because you are the expert and it's simply this, just assume that what I tell you is true and assume that 46–year–old fire lieutenant, Lt. Oliver, assume further that he had no serious known illnesses, in other words, he didn't know about this arteriosclerosis … in the past and that, further, he, himself, had a history of indigestion—before I go on, did you, I better ask you, I think we have that exhibit here, did you have the benefit of the autopsy? Did you review that at one time?

Dr. Hall: Yes, I have the autopsy copy.

Counsel: And—that he had a history of indigestion for some years which occurred particularly after eating and he smoked somewhat mildly, I believe, not too much from what I can understand, that he was at work and he was a supervisor, he was a lieutenant of his crew, he had no known history of heart disease that he knew about but was some pounds overweight, kind of stocky build and he reported to work at 6 p.m. on December 17, 1980 for an overnight shift till 8 p.m. [sic] the following morning on the 18th of December 1980, in other words, he's going to work overnight, or graveyard, as we used to call that sort of thing, he was assigned to Fire House 10, or Station 10, but there was a two-alarm tanker fire in the south area of the city so that Station 10 was required to move over to Station 4, and Station 4 had reported to that alarm fire, and he and his crew were on alert and standby or backup for the tanker fire, for at any time to go to that fire or any other fire that might come in the city in the sense of that they have to cover the whole city. That he went to bed sometime approximately one o'clock until, and was then later discovered dead. *Now, doctor, what I want to ask you based upon his being a fire fighter and the tensions that I think you are familiar with from those and what had been testified to that a fire fighter goes through the fright of, if you will, of going to a fire that they might be hurt.* Assuming all these facts to be true, do you have an opinion within reasonable medical certainty as to whether or not the condition of Charles, on December 18, 1980, which has now been diagnosed after his death as being an atherosclerotic heart disease, whether or not his work activities has any causation or connection

to that? Do you have an opinion to a degree of medical probability? [Emphasis added.]

Dr. Hall: I feel that it certainly can be related, and most probably was related.... I believe in stress is a factor in cardiac disease.

Counsel: And that would be a contributing cause to this arteriosclerosis, is that correct?

Dr. Hall: Not specifically to the atherosclerosis, but to the whole picture and which the—at the end you get some spasms in the artery that aggravates this condition and—that's it.—And circulation decreases, you get ischemia and ultimately you can get death.

Counsel: So it would be fatal, then?

Dr. Hall: Yes.

Counsel: And, is that your opinion of what happened to Lt. Oliver in this case?

Dr. Hall: I feel that's true.

That medical expert testimony satisfies the requirement of Section 52–1–28(B) if the elements of Section 52–1–28(A)(1) and (2) are met. We examine each of these elements.

Section 52–1–28(A)(1) allows compensation only when the worker has sustained an accidental injury "arising out of" and "in the course of" the employment. Assuming an accidental injury, there still could be no recovery if it did not arise out of the employment. "Arise out of" relates to cause. *Hernandez v. Home Education Livelihood Program, Inc.*, 98 N.M. 125, 645 P.2d 1381 (Ct.App.1982). In *Williams v. City of Gallup*, 77 N.M. 286, 289, 421 P.2d 804, 806 (1966), the supreme court said:

> For an injury to "arise out of" the employment, there must be a showing that the injury was caused by a risk to which the plaintiff was subjected by his employment. The employment must contribute something to the hazard of the fall. Compensation has been denied where the risk was common to the public, *Martinez v. Fidel*, 61 N.M. 6, 293 P.2d 654 [1956], and where the risk was personal to the claimant, *Berry v. J.C. Penney Co.*, 74 N.M. 484, 394 P.2d 996 [1964]; *Luvaul v. A. Ray Barker Motor Company*, 72 N.M. 447, 384 P.2d 885 [1963].

Section 52–1–28(A)(2) requires that the accident be reasonably incident to the employment. Even before an injury may be said to be compensable as "arising out of employment," the accident causing the injury must result from a risk reasonably incident to the employment. *Gilbert v. E.B. Law & Son, Inc.*, 60 N.M. 101, 287 P.2d 992 (1955). Both the accident and accidental injury must reasonably relate to the employment.

The term "accident" or "accidental injury" denotes an unlooked for mishap or some untoward event which is not expected or designed. *Gilbert v. E.B. Law & Son, Inc.* An accident may take the form of exertion, which need not be unusual or extraordinary, but must rise above mere surmise or speculation. *Alspaugh v. Mountain States Mutual Casualty Co.*, 66 N.M. 126, 343 P.2d 697 (1959). Thus, there must be proof of the exertion with particularity as to time, place and circumstance, and the "relation between the effort and the proof of its result must be positive, direct, immediate and easily identifiable, and not of a kind that can be found in the normal progress of every coronary involvement." *Id.* at 130, 343 P.2d at 699. The exertion may be either physical, *Segura v. Kaiser Steel Corp.*, 102 N.M. 535, 697 P.2d 954 (Ct.App.1984), *Bufalino v. Safeway Stores, Inc.*, 98 N.M. 560, 650 P.2d 844 (Ct.App.1982), or emotional, *Little v. J. Korber & Co.*, 71 N.M. 294, 378 P.2d 119 (1963). In the present case, the claimed accident was emotional in the form of stress associated with being a fireman on standby duty subject to call.

To summarize, under Section 52–1–28(A)(1), (2) and (3), plaintiff must show three causal connections: (1) between the accidental injury and the employment; (2) between the accident and the employment; and (3) between the disability and the accident. Viewing these three requirements together, plaintiff must necessarily establish a causal connection between the accident and the injury and the injury and the

disability. *See Alspaugh v. Mountain States Mutual Casualty Co.* Proof of these causal connections overlaps.

The parties have argued this case on the basis of a causal connection between the heart attack and job-induced stress. Thus, the parties have combined their arguments to address the causal connection between the job and the stress, and between the heart attack and the stress.

■ The problem with plaintiff's proof is that while she developed evidence of a general nature as to stress associated with certain aspects of the occupation of being a fireman, she offered no proof of stress as related to Lt. Oliver individually at or near the time of his death. As to the occupation, Chief Ortega testified:

Fire fighting is a stressful occupation. It's one where the fire fighter waits for the incident and he sits around in the fire station waiting for the alarm to hit, any type of incident he might respond to. It has been referred to as a stressful job in that waiting period.

Chief Ortega recalled two fire fighters who had died of heart attacks. Mr. Archuleta, a member of Lt. Oliver's unit, said, "I guess there is some tension there, because you don't know what to expect." He stated that he always said a little prayer when the alarm sounded to "help me go there and perform my duties and return back in good health." Another member of the unit, Mr. Martinez, when asked what it was like when the alarm goes off, said, "You can feel, you know, getting excited, your heart beat comes up."

While this evidence suggests some stress as to the occupation of fire fighting in general, it proves nothing as far as Lt. Oliver and, more importantly, it does not establish any identifiable stress at or near the time of his death. In fact, the entire evidence is to the contrary.

The record reflects an uneventful evening. The fire fighters ate popcorn, ordered hamburgers, watched television, talked and then went to sleep. According to Chief Ortega, a change of location is a routine procedure; it is done so as to provide coverage for the city when a company is away on call. He said there was nothing stressful in changing quarters. Archuleta testified that Lt. Oliver appeared normal, that he was not upset or excited. With respect to the fire, Archuleta said Lt. Oliver mentioned, "It's a good one; it's an oil spill." Martinez confirmed that nothing out of the ordinary happened on the evening of December 17.

Additionally, the evidence also shows that Lt. Oliver was not an excitable person. The widow, in response to a question from the trial court as to whether Lt. Oliver would "stew about his job," said, "No, he loved his job, he was not worried." The same type evidence came from fellow fire fighters. Dr. Hall, while stating that Lt. Oliver was "easy going," said he suspected that decedent might have been a little uptight; however, he never treated Lt. Oliver for stress.

Absent any evidence of emotional stress, particularized as to time, place and circumstance the evening of December 17 and the morning of December 18, the most that can be said of the medical opinion is that it connects Lt. Oliver's death to the occupation of fire fighting. This does not meet the standard laid down in *Alspaugh v. Mountain States Mutual Casualty Co.* and followed in other heart cases. In each case where recovery has been allowed, there has been some easily identifiable exertion, either physical or emotional, that medical testimony connected to the disability or death. *See, e.g., Little v. J. Korber & Co.* (worker died short time after becoming upset over error in charge ticket); *Turner v. New Mexico State Highway Department,* 98 N.M. 256, 648 P.2d 8 (Ct.App. 1982) (worker suffered fatal heart attack about three minutes after physical exertion in sun); *Bufalino v. Safeway Stores, Inc.* (while performing heavy lifting work, worker felt sudden disabling pain in chest and suffered myocardial infarction); *Segura v. Kaiser Steel Corp.* (worker suffered myocardial infarction immediately following strenuous physical exertion). Unlike those cases, the record here is barren of any evidence of stress involving Lt. Oliver.

We note the trial court did make an evidentiary finding that Lt. Oliver "routinely exercised by jumping rope and doing isometrics * * *." This "finding" would have no bearing on the result reached. While there was no evidence that Lt. Oliver exercised during the evening of December 17 or the morning of December 18, Archuleta said he and Lt. Oliver routinely jumped rope and did isometrics "prior to the incident." Even if that testimony could be considered under NMSA 1978, Evid.Rule 406 (Repl.Pamp.1983), nevertheless, there is no expert medical testimony causally connecting Lt. Oliver's heart attack and death with any physical exertion.

Absent evidence of an accident in the form of an identifiable emotional exertion particularized as to time, place and circumstance, the medical opinion as to causal connection lacks probative value and fails to meet the requirement of Section 52–1–28(B).

What plaintiff essentially seeks is a rule that would recognize particular occupations as presumptively stressful or stressful per se. Michigan, by statute, has created a presumption that respiratory and heart diseases or illness suffered by fire fighters arise out of and in the course of their employment. Mich.Comp.Laws Ann., § 418.405 (West 1985); *Achtenberg v. City of East Lansing*, 421 Mich. 765, 364 N.W.2d 277 (1985). New Mexico has no similar statute. To create such a rule in the present case would contravene the clear standards announced by the supreme court in *Alspaugh v. Mountain States Mutual Casualty Co.* and followed in later cases. Further, there is no proof in the record of this case that would warrant a presumption or a per se rule that heart disease is related to the occupation of being a fire fighter. The only evidence suggests just the opposite. In response to a question from the trial court, Dr. Ramo, a cardiologist, said that fire fighting is not a high risk occupation in the generic sense. The clear implication of the testimony from both Drs. Ramo and Hall is that each case must be viewed on an individual basis. Some people cope with stress, others do not. That notion fits in with the standards of *Alspaugh v. Mountain States Mutual Casualty Co.*

In order to be compensable, the accidental injury must arise out of the employment. All we know is that Lt. Oliver spent an uneventful evening and then retired. He died in his sleep. This could have occurred at home. The fact that Lt. Oliver died at work does not make the claim compensable unless plaintiff proves a causal connection between the employment and the heart attack. Plaintiff failed to prove this connection.

Because of the failure of proof, we reverse and remand for dismissal.

IT IS SO ORDERED.

DONNELLY, J., concurs.

GARCIA, J., dissents.

GARCIA, Judge (dissenting).

My colleagues have identified causation as the dispositive issue in this worker's compensation case and conclude that there was a failure of proof establishing a causal connection between Lt. Oliver's death and job-induced stress as a medical probability. I respectfully disagree.

Specifically, the opinion indicates that while plaintiff developed evidence of "[a] general nature as to stress associated with certain aspects of the occupation of being a fireman, she offered no proof of stress as related to Lt. Oliver individually at or near the time of his death." Further, in commenting on the evidence which was presented concerning occupational stress, the opinion states:

> While this evidence suggests some stress as to the occupation of fire fighting in general, it proves nothing as far as Lt. Oliver and, more importantly, it does not establish any identifiable stress at or near the time of his death. In fact, the entire evidence is to the contrary.

For this proposition, the opinion relies heavily on *Alspaugh v. Mountain States Mutual Casualty Co.*, 66 N.M. 126, 343 P.2d 697 (1959). I believe *Alspaugh* provides an inadequate foundation upon which to construct a sound rationale for reversal.

The facts in *Alspaugh* are sufficiently distinguishable from our present case. In *Alspaugh*, decedent's widow sought to show that her husband's death was due to a heart attack and that the heart attack was caused by his work as a supervisor with the New Mexico State Highway Department. The record indicates that he had suffered a heart attack and, thereafter, was off work for several months while he received treatment at various places and hospitals. He died three months later. At the time of trial, the most plaintiff's medical experts could say about decedent's cause of death and his relation to employment was: "[T]he deceased *might* have suffered a heart attack from the condition of his employment and the heart attack *might* have been the cause of death. * *"" (emphasis added). Neither doctor expressed an opinion apart from the "possibilities" as to decedent's cause of death. The only evidence as to the cause of death was a death certificate listing "Hypertensive Arteriosclerotic Heart Disease Generalized" as an immediate cause, and "Cerebral Atrophy" as a contributing cause. The supreme court noted that decedent's doctors had neither attended to nor seen him within six weeks of his death and the doctors expressed no opinion as to the cause of decedent's death. In commenting on the death certificate, the supreme court said: "[W]e do not understand the language of the certificate to indicate death resulted from a heart attack or accident suffered some three months or more previously, or from complications resulting therefrom." *Id.* at 129, 343 P.2d 697.

The central issue in *Alspaugh* was whether a causal relationship had been established between the accident and the injury and between the injury and the death. In resolving the question against the claimant, the court explained that a death resulting three months after a heart attack, without expert testimony indicating the probabilities as opposed to mere possibilities, was insufficient to provide the causal connection. This point is highlighted by the court's language:

> [T]he "natural experience of mankind" does not "suggest the presence of a causal connection" where more than three months elapsed between the second heart attack and the decedent's demise. There was no medical testimony of a causal connection, and certainly if the medical experts were unable to so testify, it is not within the province of the court to assume such a causal connection[.]

*Id.* at 130, 343 P.2d 697.

We are not faced with the problem that arose in *Alspaugh*. Here, there was positive, direct testimony from an expert medical witness specifically linking Lt. Oliver's work as a firefighter with his heart attack and the heart attack with his death. Dr. Hall's response to the hypothetical question referred to in the body of the opinion, should be sufficient to provide the requisite causal connection. *Little v. J. Korber & Co.*, 71 N.M. 294, 378 P.2d 119 (1963). There was more. Plaintiff's Exhibit No. 3 was admitted into evidence. It states in relevant part:

> [I]t is my professional opinion that his [decedent's] condition was caused by a great deal of stress, tension and exertion related to his job as a fireman for the city of Albuquerque.
>
> It is a known fact that stress is a causal factor in coronary artery disease. There is no question that Mr. Oliver's employment as a firefighter was without doubt stressful. * * *
>
> . . . .
>
> Although some individuals handle stress better than others, Mr. Oliver was not one of these individuals as he succumbed to a stressful situation as a firefighter.
>
> Once again the medical relationship between Mr. Oliver's work requirements and his demise from heart disease, was the major factor in the cause of death.

Dr. Hall's testimony and his letter, Exhibit No. 3, provided the requisite causal connection which was absent in *Alspaugh*. Unusual exertion in one's occupation is not required. Rather, usual, ordinary exertion suffices. *Sanchez v. Board of County Commissioners*, 63 N.M. 85, 313 P.2d 1055 (1957); *Bufalino v. Safeway Stores, Inc.*,

98 N.M. 560, 650 P.2d 844 (Ct.App.1982). The opinion would indicate that nothing of significance occurred that would have resulted in stress sufficient to trigger a heart attack. I would find to the contrary. I believe there is ample evidence of stress, both as it relates to firefighters and to decedent. First, decedent was employed in a highly stressful occupation. Secondly, decedent was more than a firefighter. He was also an Emergency Medical Technician (EMT) and, as a result, was required to respond to a variety of life threatening situations involving serious injury or death. Finally, he was a fire unit supervisor and thus shouldered a greater responsibility not only for his own life but for the safety of men and women within his unit. *See Alspaugh* (general supervision of work stressful situation).

The record indicates that Lt. Oliver's unit had been placed on standby status to respond as additional help or as back-up to a large oil fire. There is tremendous stress that is attributable to simple standby duty. It is important to keep in mind that stress can occur even while waiting or asleep. Dr. Isaiah M. Zimmerman, a nationally recognized expert on occupational stress, writes:

> Stress is a nonspecific response to outside demands. It is the state of being "on duty." Even as we sleep we are responding to various demands of the body, the environment, and the mind (dreams). Thus, stress is a normal accompaniment of life. As demands increase, the body and the mind reorganize continually to cope with them. Eventually, under chronic conditions of overload, the efficiency of that coping process becomes marginal, and the quality of work and personal life is threatened.

Zimmerman, *The Judges' Journal*, Vol. 20, No. 3 (1981).

The record indicates that it was not an ordinary evening. A gasoline tanker had overturned, spilling some 9,000 gallons of fuel. An electrical spark ignited the fuel and four firefighting units were dispatched at the first alarm. Shortly after the units arrived, a second alarm was called in and nine additional firefighting units were required to respond. Plaintiff's own unit was placed on standby and moved to another station so as to respond more quickly to other emergencies and to be available for call-out on a further alarm. Referring to the gasoline fire, Lt. Oliver had indicated "It's a good one; its an oil spill." The exhibits introduced into evidence indicate that thirty city firefighters were called out to battle the blaze. They were joined by six firefighters from Kirtland Base together with twelve police officers who were used to control traffic. Even though decedent was not physically present at the fire, it was reasonable for the trial court to believe that the standby situation caused extra stress.

Under our standard of appellate review, we are to determine if there is evidence that supports the trial court's finding. In this case, I believe the evidence would sufficiently support the trial court's determination that decedent suffered an accidental injury which was causally related to his occupation as a firefighter.

I would affirm the trial court.