353 P.2d 989

Rex HOLLAND, Rex Holland, Administrator with the Will Annexed of the Estate of John G. Holland, Deceased, Plaintiffs and Appellants,

v.

Arthur E. MORETON, Ethel T. Moreton, also known as E. T. Moreton, John R. Moreton, also known as J. R. Moreton, Rose Ann Moreton, Susan Moreton Tevis, Defendants and Respondents.

No. 8740.

Supreme Court of Utah.

July 8, 1960.

392

Rawlings, Wallace, Roberts & Black, Salt Lake City, Nick C. Spanos, Kansas City, Mo., Wm. Jerome Pollack, Los Angeles, Cal., for appellants.

Gustin, Richards & Mattsson, E. Ray Christensen, Salt Lake City, for respondents.

McDONOUGH, Justice.

In this action Rex Holland and his father John G. Holland (now deceased) sought recovery against Arthur E. Moreton (and members of his family as his transferees) to recover damages suffered because of fraud practiced upon the plaintiffs by Arthur E. Moreton in connection with the sale of certain mining claims to Columbia Iron Mining Company, a subsidiary of United States Steel Corporation. The factual background of this case appears in the opinions in the report of another phase of this case,[1] which we refer to and recite such further facts as are necessary to the disposition of the issues presented on this appeal. In that case we affirmed a determination of the trial court that no cause of action for fraud existed against Columbia Iron Mining Company, but remanded the case for trial against the individual defendants, the Moretons, Arthur E. Moreton, his wife, and adult children. Inasmuch as the transaction was handled by Arthur E. Moreton, he is the only defendant we refer to hereafter in discussing the facts.

Upon further proceeding, the trial court dismissed the action as to the estate of John G. Holland, but after a trial submitted Rex Holland's case to a jury which found in his favor. Thereafter the court vacated the jury verdict and dismissed the action as to plaintiff Rex Holland also, apparently upon the ground that the action has not been

1. Holland v. Columbia Iron Mining Co., 4 Utah 2d 303, 293 P.2d 700.

brought within the statute of limitations, that is, within three years after the discovery of the fraud.[2]

Rex Holland appeals on his own behalf and as executor of his father's estate, contending that the evidence amply supports the jury's finding that defendant Arthur E. Moreton was guilty of fraud; and that the Hollands did not discover it until less than three years before the commencement of the action. It is important to keep in mind that the jury having found for the plaintiffs, they are entitled to have us review the evidence and every reasonable inference fairly to be drawn therefrom in the light most favorable to them and their contentions.[3]

The facts in summary are: that John Holland, his son Rex, and one Murie had for many years owned three unpatented mining claims near Iron Mountain west of Cedar City in Iron County. The defendant Arthur E. Moreton, an attorney, knew of the desire of Columbia to acquire iron mining properties to supply its plant, Geneva Steel, in Provo, Utah. He talked to the plaintiffs at Cedar City in 1946 and an agreement was arrived at that he would undertake to obtain patents for the claims and negotiate a sale for them, in return for which he was to receive a one-fourth interest, together with an option to purchase the other three-fourths. The claims were patented and it was determined that there appeared to be about 1,500,000 tons of ore on the properties. Arthur E. Moreton so informed the parties but told them that because of the overburden it could not be expected to bring over 10¢ a ton; that he could probably get $133,000 of which the Hollands and Murie would get $100,000, leaving $33,000 for Moreton. It was also shown that he stated that the claims might possibly bring "a little bit more" than $133,000, but no more than $155,000.

After discussion and consideration of several possible arrangements between the parties a final "agreement of ownership" was prepared by Moreton by which he was to have one-fourth and the Hollands and Murie were each to have one-fourth. It also recited that if the sale was "slightly in excess" of $133,000 Moreton could have the excess as compensation for his option to purchase their interests.

Moreton told the Hollands to leave the business of selling the claims to him and cautioned them not to talk to anyone else about the matter. The negotiations for the sale of the claims culminated in the fall of 1948. In two letters, one dated October 16, 1948, and another dated November 20, 1948, which he prepared and presented to the plaintiffs for signature, they offered to sell their three-fourths' interest to Columbia for $100,000. It avoided reference to the total amount which the claims would be sold for

2. Sec. 78–12–26(3) U.C.A.1953.

3. Ostertag v. La Mont, 9 Utah 2d 130, 339 P.2d 1022.

but included this idea, as expressed in the first letter:

"Needless to say, Mr. Moreton may offer and sell his interest in said claims for whatever price you and he may agree upon, if he so desires, and the entire proceeds therefrom will, of course, be his sole property, it being his right to determine and to receive whatever amount you may agree upon with him."

Moreton took this letter to Cedar City and procured the plaintiffs to sign it and mailed it to Columbia.

There are various aspects of the evidence which tend to support the position of the plaintiffs that Moreton was keeping from them information as to the total amount of money involved in the sale of the claims. The evidence is that after the sale had been agreed upon Columbia caused a single deed to be prepared for the parties to sign conveying the claims to it. But without telling the plaintiffs of this fact, Moreton requested of Columbia that his transaction be by a separate deed. His stated reason is that he did not want to join in the warranty of the Holland and Murie share of the claims. The strange thing about this is that their titles all derived from exactly the same source and Moreton had just completed securing the patents.

The transaction was handled by separate instruments, as Moreton had requested, and was done in his office on the same day, December 20, 1948. The evidence is in sharp dispute as to just how this was accomplished. Moreton claims that the terms of the sale were read aloud in the presence of the plaintiffs and that they thus either should have known what he was getting for his interest; or alternatively, that it was none of their concern. The plaintiffs' evidence is to the contrary: that on looking back at what happened it is obvious that Moreton so managed the affair as to deliberately conceal the true facts from them in this manner: the Hollands and Murie signed first and completed their transaction in one part of the office, receiving $100,000 for their three-fourths' interest. In the meantime, while their attention was absorbed in thier part of the transaction, on another desk a short distance away, the Moretons signed a separate deed for which Columbia agreed to pay $287,500 for his one-fourth interest, which fact was not made known to the Hollands.

Notwithstanding Moreton's protestations that the Hollands had full information concerning the business transaction, our review of the evidence leaves no doubt that there is ample support for the jury's acceptance of the plaintiffs' contention to the contrary. The fact is that Moreton has not always taken the position that they had any right to such information. It rather appears that at the time of the negotiations and carrying out of the business under discussion, he en-

tertained the view that he had no duty to make any such disclosure to them and that it was none of their business what he received for his share. In fact some of his testimony indicates that he was possessed of that notion at the time of the trial. On cross-examination he testified:

"Q. Will you now tell me when it was that you told the Hollands and Murie, for the very first time, that Columbia was paying 25 cents a ton for the M & H Claims? A. I never told them that at any time.

"Q. You never told them? A. No."

■ At the trial and upon appeal Moreton made much of the fact that his deed to Columbia recited the actual consideration paid and that the correct amount of revenue stamps was affixed. This he states was done at the time of the transaction described above; and also that the deed was recorded, which he claims should have given constructive notice to the plaintiffs of the price paid. This contention is a two-edged sword. In view of the entire picture as to his conduct, the jury could well have believed, as they apparently did, that his taking particular care to do those things may have been part of a preconceived plan to conceal the true facts from the Hollands, and cover up the tracks of his deception by later calling attention to those facts. It is common knowledge that in real estate transactions deeds usually do not state the full consideration but recite only a nominal one. It has long been recognized that zeal to give the external appearance of honesty may be a badge of deceit.[4]

■■ The averment that the plaintiffs had notice by the recordation of Moreton's deed is unsound. It imparts notice only to parties who have some duty to search the record,[5] such as purchasers or others acquiring a subsequent interest in the property.[6] There was no such duty on the defendants. Nor were they under any duty to maintain a careful supervisory check on Moreton's actions. He was acting as their attorney and agent and they were entitled to trust him; and it certainly does not lie in his mouth to say that they shouldn't have done so.

Further indication that Moreton's dealing with the Hollands was not consistent with good faith and fair dealing is found in the letter written by him on December 18, 1951, shortly after the Hollands had learned further facts concerning the transaction, Rex Holland wrote to him about the

4. Twyne's Case, 3 Coke, Rep. 80(b), 76 Eng.Rep. 809, 5 E.R.C. 2, 1 Smith Leading Cases 1, 18 Am.Law Reg.N.S. 137.
5. Gates v. Kansas Farmers' U. R. Co., 153 Kan. 459, 111 P.2d 1098; Atocklassa v. Kinnamon, 132 Okl. 139, 269 P. 1080.
6. Froelich v. United Royalty Co., 178 Kan. 503, 290 P.2d 93.

matter. In response thereto he wrote charging Rex Holland with attempting extortion. He stated among other things that:

"The State authorities, the FBI and the postal authorities are interested in extortion cases,"

and threatened him thus:

"If I hear anything further of this matter as expressed in your letter * * * I shall have no alternative but to turn the matter and your letter over to the proper prosecuting authorities. However, if I hear nothing further from you on this matter, I shall forget that I ever received the letter."

This threat is in conformity with what appears to have been Moreton's general attitude and pattern of conduct toward the Hollands in manifesting a sense of superiority over them because of his professional education and experience and their apparent naivete. The fact is that instead of his being a victim of threatened extortion, he himself was running afoul of the spirit of the law prohibiting threats of criminal prosecution to gain an advantage.[7] The fact that Moreton was their attorney in whom they had the right to place their trust, and the wide difference in education and experience in the subject at hand, resulting in the parties being in such unequal positions are things which the jury were entitled to take into consideration in determining the issues between them.[8]

In regard to Moreton's duty to make full disclosure to the plaintiffs of all material facts pertaining to the transaction: the testimony and the documentary evidence shows without question that he was acting under an agreement to serve them as attorney to patent the claims and that he also agreed to sell the claims for all of them; and that he drew up a series of instruments: ownership agreements, location certificates, application for patents, affidavits, powers of attorney, and deeds; and also wrote letters relating to the patenting and the selling of the claims in which he was acting for the parties. He continued to so act and perform such duties right up to the time the final sale was consummated in his office. In this attorney-client and agency relationship he was plaintiffs' fiduciary, and owed them the duty to make a full and fair disclosure of all material information pertaining to the transaction.[9] The fulfillment of this duty is particularly important in a transaction where he was personally profiting and acting on his own behalf as well as representing the interests of the plaintiffs.

7. Sec. 76–19–1, 2 et seq. U.C.A.1953; 135 A.L.R. 728.
8. Reese v. Harper, 8 Utah 2d 119, 329 P. 2d 410.
9. Omega Investment Co. v. Woolley, 72 Utah 474, 271 P. 797; In re Swan's Estate, 4 Utah 2d 277, 293 P.2d 682.

■ The question of the running of the statute of limitations of three years for actions in fraud is closely tied to the jury's findings on the primary issue of whether a fraud was perpetrated. If the jury had accepted the defendant's contention that the Hollands knew the facts at the time the property was deeded, then there would have been no fraud; and even if there had been, the statute would have commenced to run at that time and the action would have been barred by the time it was brought. But the difficulty with the defendant's position is that the jury chose to believe the plaintiffs' evidence which was to the effect that they did not know the facts at the time of the transaction and that the first knowledge they had of the true facts was in October, 1951. This action, having been commenced in December, 1952, was well within the limitation of time prescribed by the statute.

As indicated by the portion of Moreton's testimony hereinabove quoted, he does not claim that he discharged his duty by personally advising the plaintiffs of the full facts concerning the transaction he was handling on their behalf. He does seek refuge in a claim that the plaintiff Rex Holland happened to obtain information concerning the purchase price obtained for the claims from a Mr. Canfield at a time which the defendant avers was more than three years before the action was brought. Rex Holland admitted having some conversation with Mr. Canfield about the mining claims being sold for a very high price, as a result of which he wrote a letter of inquiry to Columbia to which he received no reply. However, he stated that in a later conversation, Mr. Canfield explained that he referred to the plaintiffs' claims together with other claims in the area; and that because of this his apprehensions concerning these claims were allayed. We see no basis in the record to justify a ruling by the trial court as a matter of law that the plaintiffs had knowledge of fraud more than three years before the action was commenced. It is our conclusion that the jury's findings on the issues against Moreton are fully justified by the evidence and must stand. But, the verdict should be modified as presently to be explained.

■ The case was submitted on the theory that if the jury believed that Moreton breached his fiduciary duty and practiced a fraud upon the plaintiffs, he was to receive none of the purchase price; and that it would be divided between the Hollands and Murie, one-third to each. The jury found for Rex Holland on this theory and awarded him one-third of the $287,500 Moreton obtained, or $95,833. We think this is error. We do not disagree with the principle that generally one who undertakes to perform a fiduciary duty and fails in it is not entitled to compensation, as we held in the case of Reese v. Harper.[10] But this

10. See footnote 8 supra.

case is distinguishable from the situation there dealt with. Here Moreton did in fact obtain the patents to the claims as he agreed and therefore under the agreement of ownership, became vested with ownership with one-fourth interest in the claims. He is therefore entitled to his fair proportion of the price for which they were sold. By the same token, so were the plaintiffs.

Moreton was negotiating the sale of the claims on behalf of himself and the Hollands. This obliged him not only to make a full disclosure of all pertinent facts to them, but to represent their interests in good faith and to give them the benefit of the bargain obtained on the sale. This means that each of the four owners of one-fourth interest should have his one-fourth of the total purchase price of $387,500, which would amount to $96,875. Accordingly it is necessary to reduce the jury verdict in favor of Rex Holland from $95,833 to $63,542 ($96,875 less $33,333 previously received), plus interest on the $63,542 from the date he was entitled to the money.

■ Further attack is made on that portion of the judgment awarding plaintiff, Rex Holland, $25,000 for punitive damages on the ground that there is no proper basis for such an award. We reject that contention, believing that the trial court was justified in submitting the issue to the jury under a proper instruction. Where there is a wrong involving the violation of a duty springing from a relation of trust or confidence, and the wrong is of a gross and aggravated nature the malicious conduct necessary to justify punitive damages may be found.[11] In submitting the issue of punitive damages the court correctly instructed the jury that they could award such damages only if they found that Moreton's conduct was wilful and malicious. The jury having so found, that portion of the jury verdict awarding the plaintiff, Rex Holland, the sum of $25,000 as punitive damages must stand.

■ The order dismissing the action as to the estate of John G. Holland was in error. With respect to that cause of action the case is remanded for trial on principles and procedure not inconsistent with this opinion; and for correction of the judgment in favor of Rex Holland as hereinabove indicated.

Costs to plaintiffs (appellants).

CROCKETT, C. J., WADE, J., and A. H. ELLETT, District Judge, concur.

CALLISTER, J., did not participate.

HENRIOD, Justice (concurring and dissenting).

11. Laughlin v. Hopkinson, 292 Ill. 80, 126 N.E. 591; Simone v. McKee, 142 Cal.App.2d 307, 298 P.2d 667, 673;

ᐧ Brown v. Sloan's Moving & Storage Co., Mo., 296 S.W.2d 20, 26.

I concur in that portion of the main opinion that reduces the verdict from $95,833 to $63,542. I disagree with the reversal of the trial court's judgment in favor of the defendant. This, primarily, because I am convinced that the facts in this case were not shown by clear and convincing evidence which we may weigh in an equity case, as must be done where fraud is the issue. This court has insisted on such quality of evidence in cases like this, on more than one occasion, one of the most recent pronouncements of which was made by Mr. Justice Crockett in Pace v. Parrish,[1] where he stated that "The burden was upon the plaintiffs to prove the fraud charged by clear and convincing evidence" (citing four other Utah cases).

Sustaining an award for punitive damages, in my opinion, is unthinkable. Not only is there an absence of clear and convincing evidence of malice, but there appears to be a clear and convincing absence of any evidence of malice at all. To conclude otherwise is a paternalism quite alien to the philosophy of veniremen sitting in like cases in the mother lode and grubstake era.[2]

The main opinion repeats the oft-repeated aphorism about "reviewing the evidence and every reasonable inference fairly to be drawn therefrom in the light most favorable" to plaintiffs. I like the paraphrasing of the rule in the concurring opinion in the former Holland case[3] where it was said:

"Viewing the evidence in the light most favorable to the plaintiff does not mean that the court should pick out all of the aspects thereof favorable to supporting plaintiff's claim and ignore those that indicate to the contrary. It means that the court surveys the whole picture, takes into consideration facts and inferences therefrom tending to favor the plaintiff's position, and also considers other facts appearing which must be accepted as a matter of law, and weighs the whole matter against the background of legal precepts bearing on the problem * * *."

The writer of this dissent considers the language last above quoted as more nearly applicable here, and more nearly substantiative of the conclusion that fraud and malice were not shown here by clear and convincing evidence. The trial court seemed to agree.

The word inference used in this case and in the former Holland case, compels agreement, I think, with this writer's views when the connotation given it by Mr. Justice Jones, author of the former Holland opinion is noted in the following words:

1. 122 Utah 141, 247 P.2d 273, 274.
2. I think this case to be a somewhat modern version of such an agreement.

3. Holland v. Columbia Iron Mining Co., 4 Utah 2d 303, 293 P.2d 700, 705.

"Inferences are made for the purpose of aiding reason, not to override it. Maggio v. Zeits, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476. Inferences are nothing more than probable or natural explanations of facts * * *. Common sense and reason dictate that evil inferences should not be permitted to be drawn from routine business transactions where there are no other circumstances. · To hold otherwise would throw the door open for an attack on each and every transaction that one might enter into. Every vendor who might feel aggrieved because he wasn't paid enough money for his property should not be permitted to come into court and have his case submitted to the trier of the facts merely because it is subsequently ascertained that he made a bad bargain. And those who are willing to sign most anything in order to obtain money should not be permitted to lightly cast aside these solemn documents and vitiate transactions which have long since been consummated."

I commend the above language to the plaintiffs in this case, who, after waiting three years, decided to sue because someone else received a larger sum in a mining property transaction, where in similar situations, a $100 grubstake more than once has resulted in sums dealing in six and seven figures to the one furnishing the wherewithal to dig, with the perfect understanding by community and court that such disparity did not vitiate a binding contract. I say this, and justify my belief that the nub of this case is not fraud but disparity, by pointing to the frequent and repeated self-serving suggestions and statements in plaintiffs' brief as to the great disparity of recovery by the parties,—a matter that has absolutely nothing to do with the case.

The trial court's judgment should be affirmed.[4] He apparently agreed with me that fraud and malice were not shown by clear and convincing evidence.

4. We have other rules that say we must pay great respect to the trial court's judgments, and should disturb them only when clearly arbitrary, etc.