516 P.2d 165

**Inga-Lill ELTON, Plaintiff and Respondent,**

v.

**BANKERS LIFE & CASUALTY COMPANY, Defendant and Appellant.**

**No. 12993.**

Supreme Court of Utah.

Nov. 20, 1973.

---

Don J. Hanson of Hanson & Garrett, Salt Lake City, for defendant and appellant.

Brigham E. Roberts and Robert D. Moore, of Rawlings, Roberts & Black, Salt Lake City, for plaintiff and respondent.

HENROID, Justice:

Appeal from a judgment entered on a jury award under the provisions of an accident insurance policy. Reversed, with no costs awarded.

Counsel reminds us that we must review the evidence in a light favorable to the verdict.[1] We will do this by not reporting or considering the evidence adduced by defendant, but only that of the plaintiff, and holding the plaintiff responsible for any such evidence representing both the less favorable to its contentions as well as that which may be more favorable.[2] So saying we abstract plaintiff's evidence in what we consider a fair and accurate appraisal thereof as follows.

In 1966, attorney Leonard W. Elton was appointed District Judge,—one in addition to nine others in Salt Lake County. About four years later, on May 13, 1970, he passed away, possessor of a reputation as having been a highly respected and hardworking jurist. He was a beneficiary under a payroll deduction *accident* policy issued to the State. It was not a *health* policy, nor a health and accident policy, nor a hospital indemnity policy. It was simply a low premium (about $170 per annum) insurance contract covering, along with disablement benefits, a death benefit of $100,000 if he should sustain a "bodily injury causing the loss (death) *directly and independently of all other causes* and *effected solely* through an *accidental* bodily injury . . . ."

1. Holland v. Moreton, 10 Utah 2d 390, 353 P.2d 989 (1960).

2. Oberg v. Sanders, 111 Utah 507, 184 P.2d 229 (1947).

Plaintiff's witnesses testified substantially as follows:

1. Dr. Dalrymple, Judge Elton's personal physician said the Judge had a heart attack in 1954, accompanied by a hernia condition. Fourteen years later [3] on January 9, 1969, Elton was hospitalized for eight days with a stroke, which affected his balance. He stopped working on the doctor's advice. On March 4, 1969, the doctor reports Elton was doing very well but that he had slurred speech at times, and was told to get some rest; that he was still doing very well on April 1, 1969, and was told to report monthly, which he did into 1970, he having resumed full-time work in October, after having worked but part time before. In checking with the doctor in early January, 1970, the Judge had some intestinal flu, and in February, a skin disorder probably due to medication, but otherwise was doing well; that on April 21, 1970, the doctor reported that:

His wife brought him into my office because he had a sudden onset of dizziness. His wife was holding him up. He was cold and clammy, and he had what is known as an astigmatism. In other words, if you look at something it is blurred. And it implies something wrong at the base of the brain. And he was quite sick to his stomach, but did not vomit. . . . I assumed he had had another stroke. I suggested that he might go to the hospital, but he would prefer to stay home. . . . [and] a week later he had another spell, . . . I asked him if he could come in the office, and she said he did not want to come, . . . However, I did change his medication because *I knew he was in for trouble.*

Again the doctor testified that on May 2, 1970:

[H]e was a little unsteady in his gait, he had had some headaches. I had to give him some medicine because he was extremely apprehensive and nervous. He didn't have any definite localizing signs that he had had a stroke in the sense that I could tell just where it was. But from his behavior and the attitude, I knew that something had happened to him that wasn't good. I again changed his medication and gave him a more potent sedative because he was extremely emotionally upset . . . [and there was no doubt he was under some stress].

On May 9, 1970,[4] the doctor, after hearing of a disorientation episode at home a few

---

3. There was nothing introduced to show the judge's medical history in the interim, and his wife didn't know whether he had sought medical advice or not.

4. The date Elton last visited the doctor before death.

days before, told by Elton's wife, reported that the Judge was in very good shape.[5]

2. Judge Wilkins, a colleague of Elton's testified he knew that Elton, the presiding judge, had been ill in January 1969 and didn't work for awhile, then part time, then full time about August or September; took work home; had a recurrence of illness in April; had some sensitive cases; became withdrawn; seemed to be taking on more work; worked a usual 8:30 to 5:00 day; that the presiding judge can assign cases to other judges; that Elton had a stroke in 1969, a year before the Ronnow and Sunday Closing cases;[6] that after the 1969 stroke, Elton had impaired speech, his arm somewhat paralyzed, but didn't think anything wrong with his legs when he resumed, until May 1970, but thought there was a "residue" left; that Elton seemed to improve in arm, face, speech and faculties, but more withdrawn and less communicative after the January 1969 stroke and in April 1970 when he became ill and did not work; that he assumed Elton was concerned about the stroke and what might happen to his family.

3. Mr. Banks, District Attorney, said the Ronnow case, one of misusing public funds, was filed March 23, 1970;[7] that Ronnow appeared without counsel; that one of Elton's colleagues took Ronnow's guilty plea on one charge, refused to dismiss six other felony charges on Banks' motion to dismiss, referred the matter to the Probation Department, disqualified himself further, and sent the case to Elton for further action; that the case caused a lot of publicity, when two weeks later, on April 6, it came before Elton, who sentenced Ronnow on the guilty plea, to a prison sentence, but put Ronnow on probation provided he served nine months, with credit for good time, in the county jail, at the same time dismissing the other six charges; that during this time Elton stopped going to the coffee shop, wasn't outgoing and talkative as before, and appeared tired; that he, Banks, had handled 25 public official cases, all attendant by public pressure; that the Ronnow appearance before Elton lasted about 15 minutes, although more time was consumed in preliminaries and discussions, but there was nothing unusual or different in the pressure brought both on him, Banks, and Elton; that at the time of the 1969 stroke, Elton was trying a murder case, no public official was involved, there was no pressure and Elton did not appear tired at that time; that in the present case Elton didn't have a stroke just after the Ronnow case,

5. This part of Dr. Dalrymple's testimony is a sort of chronology, and his diagnostic and prognostic testimony is treated later.

6. Two cases provoking unusual publicity, which cases counsel assign as being largely

responsible for the unusual stress and strain alleged to have been an "accident" covered by the accident policy.

7. About seven weeks after Elton's death.

but 36 days after; that he, Banks, had not been in Elton's court after April 6, 1970.

4. Mr. Waldo, counsel in the Sunday Closing case, filed suit on April 6, 1970, and the first meeting with Elton was in mid-April for 45 minutes to an hour; that case created a lot of publicity and extensive news coverage; that Elton set up a rather strenuous schedule, and once they met on Arbor Day, a State holiday, which lasted half a day. A full-dress hearing was held May 6, after six briefs had been filed, beginning at 10 a. m., with a recess, adjournment at noon, back at 2 p. m., with recess and adjournment at 5 p. m., when the case was taken under advisement; that in the forenoon, Elton had been alert, but the tenor changed in the afternoon, when his attention seemed to wander, when he abruptly recessed in the middle of an attorney's sentence, and hurriedly left the bench, returning tired, asking no questions, and when he did talk his words were slower, more drawn and labored; that after one postponement because he did not feel well, he finally decided the case on May 12 in a crowded courtroom, coming late and appearing tired, taking considerable time to get on the bench, and speaking in a low voice difficult to hear, rendering his opinion in about one sentence, and taking a little period of time to say it.

5. Elton's bailiff, Mr. Calton, testified the Judge had several cases that took a good deal of time under quite a lot of pressure; that Elton had a stroke in 1969 and had just about recuperated in April and May, 1970, when he had a little effect in his arm; that he became tired and irritable and between May 6 and 12 the pressure was greater; that it was not unusual for his, Mr. Calton's, succeeding judge to hear cases from 9 a. m. to 5 p. m.; that he did not say Elton's cases were more difficult, but there were more of them, and there was nothing unusual for judges to have crowded calendars.

6. Mr. Shewell, court clerk, said in June, 1969, Elton was working half time; that he had a speech impediment, with noticeable improvement in April, 1970; that in March, April and May, 1970, his case load was heavy, and he had pressures in the Ronnow and Sunday Closing cases from newspapers; that about 60 cases piled up; that Elton seemed tired and slowing down; that the court minutes for March 2 to May 12, 1970, showed the work load two weeks before the death was comparatively light.

7. Judge Elton's wife said his health was good before his 1969 stroke, when he was hospitalized for ten days, staying home some time thereafter, later working one hour a day, then two, then four in summer, then full time in August, getting better all the time; that he worked hard in February and March, 1970; had a speech impediment from the 1969 stroke, but began using his arm; that Ronnow came

along on April 6, 1970, a public case, where the Judge received a lot of calls, that wouldn't bother him before; that the Sunday Closing case came the latter part of April; that he spent his days like other judges but spent a lot of time studying at home before he went to bed early; that he skipped lunches; that on April 20, 1970, he had a check-up at the doctor's and next day complained of dizziness, when he was told he was working too hard; that he was to have a hearing April 29, but postponed it because of a dizzy spell; that she took him to the doctor who told him to stay home which he did for a few days; that on May 5 he retired early but didn't respond when seen at 11 p. m., when he was just staring, having lost his memory completely, not knowing who or where he was or who she was; that she called her children and sat with him until 3 a. m., trying to revive his memory but to no avail; that he went to a hearing next morning; that from May 7 to the 12th he stayed home, and orally gave his decision that day, when he was tired and dragging; that the next morning he died in the hospital.

8. Dr. Dalrymple again testified that on that date he saw Elton at the hospital, unconscious, weak, sweating and blue, and that:

. . . [H]e had very rapid respiration, the sort of thing you see in a terminal condition. His pupils were dilated, which is a bad sign. And he had a rigid neck, which is a sign that there is either some irritation in the nervous system, or blood or infection such as you would see in meningitis. His heart was irregular. I could obtain no blood pressure, and his clinical picture was that of a terminal individual. . . . There was swelling, the brain became swollen, pushed it down in the little thing in the back of the neck and this caused the spinal cord to swell and all the vital centers were just destroyed.

An autopsy was had and introduced as an exhibit by plaintiff. Dr. Dalrymple further testified from information herein and from his own knowledge that the immediate cause of death was circulatory collapse, and that:

In other words his pumping mechanism failed, he couldn't put out blood, all his reflexes went to pot, and he collapsed . . . due to damage to his brain . . . caused by this mechanism or this process which caused him to have the stroke.

After a hypothetical case was put, which assumed a general fact situation from April through the time of death, Dr. Dalrymple replied in response to a question as to what effect such facts had in precipitating the stroke, that:

Well I don't quite understand sir. You say [he was] comfortable and hap-

py. Are you assuming this man was perfectly well? I mean he was sick.

Further, he stated that:

I think stress is definitely predisposing to *any* disease process, especially the arteries. Gosh, we get it every day now, everything is stress. . . . And I didn't think he was going to die that fast.

Also that he assumed Elton's arteriosclerosis had something to do with Elton's myocardial infarct (blood stoppage), and that there were a number of factors causing arteriosclerosis and that the extent to which Elton had was a continuing thing and progressive. In such continuing problem, he said, "Anybody that has had a stroke is a sick person and should be observed . . . and I hoped I could prevent another one"; and that Elton likely would have another stroke in the future. He said that fear that one might die was one of the stresses that people have who have had strokes, and one is that they might die and leave their families,—"one of the largest hurdles we have to overcome in getting people well" since "they get depressed, and they are sure they are going to die," but "I wasn't impressed with that with Mr. Elton." Dr. Dalrymple in his deposition in being asked about the incidents leading to Elton's death, and Elton's cerebral condition said, "That from the autopsy it was surprising that Elton survived as long as he did with the heart condition he had."

9. Dr. Null testified that the blood flowing through rusty pipes (blood vessels) is very difficult; that the autopsy showed moderate arteriosclerosis; that according to Dr. Dalrymple, from the 1969 incident, Elton had a cerebral thrombosis, or a stroke, and had weakness of the left lower and upper extremities,—the left arm and leg and neurological changes accompanying a stroke,—in the *medical* sense a cardiovascular accident. Answering a hypothetical question as to part of the events,—April 6 to May 13,—he said it "*aggravated* the *underlying* condition" and "markedly aggravated his cerebral vascular disease," saying further that:

I think the situation you describe in an individual with cerebral vascular disease, who has had a stroke who has obviously become worse under the stress, it is probable that the stress and activity did agravate the *underlying condition* and was *associated* with his death, .

and that the January 1969 stroke, the visit to Dr. Dalrymple on April 21, 1970, where Elton was cold and clammy with astigmatism, stomach sickness, and the May 5 disorientation, loss of memory, not knowing who he was or where, or that he was a judge, and the event of death a week later on May 13, were recurring at more regular intervals; that arteriosclerosis is a pro-

gressive disease, and that death may be influenced by a "whole host of factors" other than simply stress; that other things besides stress which affect the rapidity of these episodes are heart failure, presence or absence of high blood pressure, presence or absence of diseases such as alcoholism, cirrhosis, liver disease, kidney disease, diabetes, emotional distress, etc. He said:

> I think Judge Elton died as a result of cerebral vascular disease, which is in *this particular case* brought about by arteriosclerosis, but markedly *aggravated* by the underlying stress which he was subjected to.

He said people who have strokes are subject to all kinds of stress, including some who have a fearfulness that they are going to die; "that the *basic cause of death* is cerebral vascular disease," which was markedly *aggravated* by the stresses Elton was under.

Null had been chairman of a medical panel to determine cause of death in a petition for workmen's compensation arising out of Elton's death and his conclusion in that case was that death was the result of arteriosclerosis. He also stated that with respect to such disease,

> Various other factors are involved and they are altered by stress. Our bodies are such that this is a fact of life, and there is little question that individuals subjected to harrassment, stress, who are ill because of pre-existing strokes, heart attacks, what have you, or just arteriosclerosis anywhere will be made worse by this type of activity.

As was stated at the outset, the above resume of the facts is reflective solely of the evidence introduced by plaintiff, including that developed on cross-examination, —to which the plaintiff in all fairness must be bound, particularly when no evidence introduced by the defendant has been reported or considered in this opinion.

The only substantial question here, is whether or not as a matter of law, the facts of this case can be said not to constitute an "accident," under the language of the policy allowing the insured's estate to recover $100,000 should he sustain a "bodily injury causing death *directly and independently of all other causes and effected solely* through an *accidental* bodily injury." In determining, as we do, that the facts of this case, as a matter of law, do not constitute such an "accident" and hence do not justify payment under the quoted language, we have the following to say:

As a preliminary matter, we think the observations made by plaintiff about appellate review and decision to the effect, I) That we should review the evidence in a light favoring the verdict,[8] are satisfied by the recitation of facts above; II) That the

8. See footnote 1, supra.

rule of "strictissimi juris"[9] should be applied in this case is not too persuasive since the language of the policy, we think, is so clear as not to lend itself to any ambiguity or uncertainty in determining what is meant; III) That cases decided under workmen's compensation laws should be dispositive here, as plaintiff contends,[10] cannot be accepted as controlling since the purposes, public policies, legal principles, statutory and contractual provisions involved in workmen's compensation statutes vis a vis commercial insurance policies are so incompatible as to lend little or no weight in attempting to establish an award in the one case as precedent for a decision or judgment in the other.

As to such position, the purpose and policy of our workmen's compensation laws[11] generally are to eliminate social and economic hazards created by unemployment and in so doing, and among other things to stablize purchasing power. This, under fixed, non-contractual statutory schedules, by assuring the unemployed person a degree of maintenance and sustenance for a prescribed period of time; where the program is not voluntary, but compulsory and the creature of legislativè fiat and interdiction,—unconditioned on basic principles anent contractual rights and/or obligations incident to and familiar in the law merchant, the laissez-faire concept, a quid pro quo philosophy, sales competition, the right to enter into or refuse to enter into a negotiated contract with another person, or the right to indulge in an across the table, David Harum agreement where a promise may be exchanged for a counter-promise or a horse if that be the binding condition. Moreover the employee has no choice as to terms, amount of benefits, negotiation or parties to a contract. The Judges' Retirement Act's[12] provision for entitlement "employs language identical to that found in" the Workmen's Compensation Act, as stated in Elton v. Utah Retirement Board (footnote 10); on which case plaintiff heavily relies. The language is to the effect that a

. . . widow of every judge who is *killed by accident arising out of* or *in the course of his employment* . . .

9. Browning v. Equitable Life, 94 Utah 532, 72 P.2d 1060 (1937); DiEnes v. Safeco, 21 Utah 2d 147, 442 P.2d 468 (1968).

10. Elton v. Utah Retirement Bd., 28 Utah 2d 368, 503 P.2d 137 (1972); Little v. J. Korber, 71 N.M. 294, 378 P.2d 119 (1963); Schechter v. State Ins. Fund, 6 N.Y.2d 506, 190 N.Y.S.2d 656, 160 N.E.2d 901 (1959); Klimas v. Trans-Carribean, 10 N.Y.2d 209, 219 N.Y.S.2d 14, 176 N.E.2d 714 (1961).

11. Title 35, Utah Code Annotated 1953, as amended, Sec. 35-4-2.

12. Title 49-7, Utah Code Annotated 1953, as amended (Laws of Utah 1971, Ch. 113; Title 49-7a-1 et seq., Replacement Vol. 5B, 1973 Pocket Supp., pp. 26 et seq.)

shall be entitled to . . . a widow's pension.

This italicized language can in no sense be affinitive to the underscored language used in the commercial *accident* insurance policy issued by a private company,[13] where a premium is paid, and which policy, unlike and quite dissimilar from the language of the statute quoted, says the company will pay $100,000 if the judge should:

> . . . sustain a *bodily injury* causing his death *directly and independently of all other causes and effected solely through an accidental bodily injury.* . . .

By and large the authorities cited by plaintiff, are workmen's compensation cases[14] where a pre-existing condition or disease such as is reflected in the medical history of Judge Elton has been *"aggravated"* or *"lighted up"* by an *industrial* accident arising out of or in the course of his employment. They are cases where the industrial accident does not have to have been caused by a *"bodily injury,"* nor does the injury or death need be caused *"directly and independently"* of *"all other causes"* nor *does the death have to be "effected"* or *caused "solely* through an accidental bodily injury."*

It seems inescapable, therefore, to conclude other than that workmen's compensation cases, including the previous Elton case, justifiably cannot be cited as being dispositive of a commercial *limited accident* policy. All this too, by virtue of the purely statutory sanction that gives them birth, the expressed policy of construing such laws liberally in favor of the worker; also, because of the mandatory conditions to which both employer and employee, without choice or bargaining privilege, must succumb, in an atmosphere where contractual principles do not prevail and bargaining for a consideration is a stranger to compensability. Also this, because of risk capital is born and subsidized by the taxpayer,—not private enterprise, whose purpose is the antithesis of subsidization where contract terms do not exist, particulary with respect to conditions negativing compensability in *"all other"* cases not specifically included or excepted.

In connection with the above, it seems apropos to point out that one of the two medical witnesses,—the only two called and relied upon by plaintiff,—one the personal physician of Judge Elton and the other a

13. We said in the Elton case that "This court has previously determined that aggravation of a pre-existing disease by an *industrial* accident is compensable and that an internal failure brought about by exertion in the course of employment may be an accident *within the meaning* of the Utah Workmen's Compensation Act. Powers v. Industrial Commission, 19 Utah 2d 140, 427 P.2d 740 (1967)." The Powers case was a workmen's compensation case also.

14. See footnote 10.

doctor who was engaged and called as plaintiff's own witness, qualified by plaintiff as being a specialist in "internal medicine and cardiovascular disease," without equivocation, testified that the events from April 6 to May 13, 1970, indicated that such events *"aggravated"* the underlying condition,—which was "cerebral vascular disease,"—which the evidence and his testimony unerringly reflected was a continuing, concurring condition. He elaborated by saying that where one who has had a stroke, as had Judge Elton, it is "probable" that the *"stress* and activity did *aggravate* the *underlying condition* and was *associated* with his death." With such proffered evidence, presented as the fact here, it is difficult to reconcile plaintiff's own sworn evidence with any sort of a theory that, with a contractual provision to the effect that there is no liability under the insurance contract unless it is shown that there was a *"bodily injury" "causing death," "directly"* and "independently" *"of all other causes"* and *"effected" "solely"* through an accidental bodily injury, the "probability" that "stress" may have "aggravated" an existing condition "solely" and "directly" and "independently" of "all other causes," reasonably could have been or was the *sole proximate cause* or the *causa causans* of the death. We believe that the English language does not demand

such elasticity as to encompass such an unrealistic conclusion. To say so would seem to defy logic, syllogistic reasoning, realism or the use of words in their commonly accepted connotation.

One of plaintiff's arguments seems to be that the policy has to do with an "injury," with some exclusions,[15] and is "unique" (according to plaintiff's voluntary suggestion), because it is worded differently than other policies with exclusions; that a conclusion must be indulged therefore that "stress and strain" must be included as an "accident" for failure to have excluded it, and I suppose presumably other unincluded exclusions must be treated as "accidents" compelling compensability and that "stress and strain" having not been excluded must be the proximate cause here. Such a position does not seem to have much to do with a specific contract with different terms, and seems to ignore a specific contract that happens to exclude certain causes and then, specifically and without equivocation whatever and for good measure, excludes *everything* else other than *"bodily injury,"* the basis for the claim and a necessary adjunct in the process of "causing the loss" (death) *"directly and independently of all other causes,"* and effected *"solely* through an accidental bodily injury." Certainly such language, according to its plain, ordinary meaning, provides for nonliability

15. Suicide, bacterial infection, medical or surgical treatment, hernia, war, accidents in military service while country is at war, aeronautics.

for causes not specifically excluded, as well as these specifically excluded. Even the rule of "idem sonans" would not be apropos here. Otherwise, seemingly there would be hundreds of causes, perhaps thousands, that a commercial *accident* policy *specifically* would have to recite as being exclusions to insure noncoverage, where an omnibus clause of excluding all other causes otherwise would not only be impotent, but would violate simple contractual principles and the lexicography of language. Such a position would have the effect of including health features in an accident policy, by failure specifically to exclude them. The common acceptance of the term "accident" fortified, as it is, by a small premium in "accident" as opposed to "health and accident" policies and "life insurance" policies would seem to be about the only protection a commercial insurance company has against any industrial, lexicological or judicial alchemy that otherwise virtually would transmute a simple accident policy into a health policy or a life insurance policy.

At this juncture it would appear only appropriate to examine the authorities relied upon by counsel for plaintiff in support of their thesis that the unusual pressure or "stress and strain," with which Judge Elton allegedly was burdened in the last months of his life, represented a compensable "accident" under the terms of the group policy having to do with accidental injury and/or death. We think such authorities justifiably can be represented by four of the cases they have cited, and for convenience are chronologically reviewed.[16]

In Pierce, unlike our instant case, *which was not based on negligence of anyone,* the insured builded his case on "fright" caused by the negligent driving of a motorist. The Washington court took the position that under an accident policy, "fright" caused by negligence of a motorist in an obvious "split-second" accident, might be classified as an "accident" under the policy, if the *negligence* of *defendant* was the proximate cause of the "fright." No negligence is claimed or involved in the instant case,—only pressure of work voluntarily assumed, but not induced or forced upon anyone by a third party's negligent act in a split-second motor vehicle incident. The court in Pierce was not hesitant, however, in pointing out that "such physical injuries" were distinguishable from purely *mental stress* or psychological disorders,—although elsewhere it said "mental, emotional or physical activity are causes of cerebral hemorrhages." (In the instant case there is no question about the hemorrhage occurring a year before.) It did not

16. Pierce v. Pac. Mut., 7 Wash.2d 151, 109 P.2d 322 (1941); Thompson v. American Cas., 20 Utah 2d 418, 439 P.2d 276 (1968); Whitlock v. Old Amer. Ins. Co., 21 Utah 2d 131, 442 P.2d 26 (1968); DiEnes v. Safeco Life, 21 Utah 2d 147, 442 P.2d 468 (1968).

say that such latter circumstances compelled any synonymity with a split-second traffic accident. The cases are not at all parallel and Pierce certainly is not dispositive here bottomed on fact or reasoning applicable to construction of contracts or the common meaning of the word "accident" as applied to insurance policies having to do with "accidents." It is significant to note that the Pierce case itself confined the concept of cause and effect in an "accident" case to a happenstance, a suddenness, so to speak, when it said that "all of the definitions" of accident "include the idea that the means as well as the result must be *unforeseen, involuntary, unexpected* and *unusual*; that it must be a *happening by chance*." Such a conception excludes completely any right of recovery under the controlling facts of the instant case,—irrespective of any jury finding to the contrary,—and there ·is no answer to the proposition that an appellate court's existence encompasses an obligation to examine the fallibility of veniremen.

The Thompson case, stated by plaintiff's counsel as being "remarkably similar" to the instant case, may be similar in one aspect, but hardly "remarkably" so. That case, involved a similar insurance policy in the sense that it provided coverage for an injury caused by "accidental means," *"directly and independently of all other caus-*

es." The case was decided on motion for summary judgment. In view of the record, indicating that Thompson, 60, taken from his regular work and for five days put to an unusual task of drilling a hole in a cement wall, in confined quarters under intense heat, requiring the use of a 35 to 40 pound jackhammer, causing exhaustion at the end of each day, we said there was a genuine fact issue as to causation of a seizure he had. His medical history included an arteriosclerotic problem, prefaced by a head injury 24 years before, but no evidence, as prevails in the instant case, of a lingering, progressive heart ailment for most of the time during a period of about 16 months prior to a third successive stroke, after which Judge Elton shortly passed away. The genuine issue of fact for which the case was returned for trial, patently seems to be concerned with the "accidental means" incident to the plain terms of the policy, and whether it was the sole cause of the disablement. In sending it back under such circumstances, it would belie the position of this court to the effect that aggravation cases, so heavily relied on by plaintiff, could not be dispositive,—since the term "aggravation" itself suggests not one but a multiplicity of causes. That the workmen's compensation cases are in our opinion not determinative where aggravation is a factor,[17] is reflected in our own

---

17. Plaintiff's evidence shows aggravation. If there were none it would be a different case, —but plaintiff cites cases for recovery where admittedly it existed.

language in Thompson, that one issue having been raised by defendant as to whether the disability resulted from accidental means "directly and independently of all other causes," the jury cannot arbitrarily establish a single, sole, direct, independent cause, where the evidence admitted by plaintiff clearly reflects facts showing contributing or concurrent causes that defy any concept of sole proximate cause. It is conceded under plaintiff's own evidence that there was aggravation. This rules out "aggravation" cases upon which it relies if Thompson be correct, and prevents Thompson from being any kind of authority on plaintiff's behalf,—particularly when we clearly said there was an issue of fact when "it is defendant's contention that even if plaintiff's disability were the result of accidental means, he was *suffering from prior disabilities which cooperated with the alleged accident*; and, therefore, the accident cannot be considered the sole cause or a cause independent of all other causes of his disability." Had Thompson been tried and the facts showed no concurrence of causes, Thompson could have won. If they showed such concurrence of causes,—as the facts in the instant case do on evidence produced by the plaintiff itself, (and in spite of what the jury found) plaintiff would have to lose under the very language of Thompson which conceded facts and our language, irrespective of what the jury did, would compel a judgment as a matter of law, that there was no liability under the clear language of the insurance policy involved here. This is the result to which we subscribe, with an affirmation of Thompson as supportive of this decision, and not at all a case supporting plaintiff's contentions.

In Whitlock, the insured bought an accident policy containing a specific exclusion for injury resulting "from any mental or bodily sickness or disease," as contrasted with·the policy involved in the instant case which had no such exclusion, and which provided coverage affirmatively *only* for "loss directly and independently of *all other causes* and effected *solely* through an *accidental bodily injury*." The facts in the Whitlock case, as contrasted with those in the instant case, reflected an instantaneous, split-second automobile crash, which in the common understanding of most everyone, was a pure and simple "accident,"—an "accident" which everyone in the case *conceded* was an accident,—whereas *in the* instant case the "accident" was not conceded or admitted, but was the contestatio litis, so to speak, where the question of accident was contested vigorously in the first instance. The incident was claimed to be an "accident," but admittedly was shown to be nothing sudden at all, such as was the case in the Whitlock crash, such as a sudden blow, or an airplane crash, or a falling brick on one's head, or a fall in the bathtub, or a slip on an undiscernible slick of

ice, or a tumble from a haystack, or a misguided dart in the eye, or a hand in the wringer and the like. Such last mentioned incidents clearly are accidents under accepted interpretation of the word "accident," and may require debatable proof to convince a jury as to whether or not there was such a sudden bolt of lightning, an air crash, an unexplained, unanticipated pratfall, instanter,—as was the case in Whitlock, where one admittedly suffering from a probable terminal cancer, appears to have sustained a completely independent, unconnected brain concussion, hemorrhaging and swelling in a crash in which one person was killed outright after all of which the insured died in less than a month. To cite the Whitlock case in support of recovery under the terms of the policy in the present case on the basis of jury jurisdiction would seem to do injustice to appellate review, to our everyday language, to the concept that the clear connotation of an "accident" policy cannot warp itself into an unclear inclusion of almost any "cause," —or that the payment of a comparatively small insurance premium for "accident" compensation, includes that which is not included as an express exclusion, and includes that which, because of exclusion, is included, and to continue the logic, to say that that which is excluded, makes everything else included, and that that which is not expressly included, is included because

it was not excluded. We do not say the Whitlock case supports either side's contention, but simply that it is different from and not apropos here as being analogistic.

The DiEnes case is cited, seemingly, for: 1) Approval of the rule "strictissimi juris" about which we have spoken and with which we have no quarrel; 2) questioning the advisability of instructing the jury about the terms of the policy, which is inapropos here; and 3) permitting the jury to interpret the terms of the policy. This author does not think the defendant's citation of this case has anything to do with the fundamental thrust urged here. The case almost reprimanded the trial court for not resolving issues for the jury before the case's submission, and for not handling the matter with due respect to the prerogatives of the jury, a conclusion with which this author agreed and now conforms. The plaintiff does not point out any responsive challenges to or respondence to the theory of and law of the case in DiEnes. The matter involved therein seems to be correct but academic, procedural and corrective, but not dispositive here.

Reverting to our observations before reviewing defendant's authorities our argument about transmutation of an "accident" to a "health and accident," or "life insurance" policy, we suggest that the thought herein expressed, better may have been enunciated in Smith v. Continental Casual-

ty Company,[18] a case involving a *commercial accident policy,* where the assured had a history of arteriosclerosis, as here, and where the court, as a matter of law determined that there was no "accident" in the common connotation of that term where "exertion" preceded a heart attack, the court saying that there was "clearly no accident (citing a dictionary) [19] in the common acceptance of that term" that "interfered with his movements at work on the day in question and thereby produced a *bodily injury which was the sole, exciting, efficient and predominant cause of death* of the insured who was normally performing the duties of his employment," and that "the fact that the exertion had an *aggravating* effect upon a heart weakened by pre-existent arteriosclerotic heart disease did not make the heart attack an injury arising out of an accident."

Our own Tenth Circuit Court in affirming a case going up from our sister state of Oklahoma, had something to say about cases like this, where more pronouncedly its renegation of liability under a commercial insurance contract whose language was almost identical to that in the instant case

was apparent.[20] There the insured, 64, fell while walking to the bathroom aided by a stroller, in which his (the insured's) robe became entangled, whence he struck his head on a cement floor. His personal physician testified pretty much as the physician did about Judge Elton here, that the immediate cause of death was "congestive heart failure," but that "however, the fall produced a thrombosis which placed strain on the heart."

██ The trial court, as a matter of law, said there was no liability under the policy under such circumstances, and *took the case away from the jury* with a directed verdict.[21] The appellate court had this to say, with which we agree, as being the sensible, logical, interpretive contractual conclusion in cases like this that:

The applicable law is that of Oklahoma, and the Supreme Court of that state has on numerous occasions construed language such as that which appears in the instant policies. Generally speaking, Oklahoma has followed the general accepted rule that where the insured is afflicted with a disease or infir-

---

18. Dist. of Col.Ct.App., 203 A.2d 168 (1964).

19. Websters New World Dictionary: "Accident: A happening that is not expected, forseen or intended; an unfortunate occurrence or mishap; sudden fall, collision, etc., usually resulting in physical injury."

20. Bewley v. Am. Home Assur., 450 F.2d 1079 (1971), where the policy provided that: " '*In-*

*jury,'* . . . means *bodily injury* caused by an *accident* occurring . . . and *resulting directly* and *independent* of *all other causes* in loss . . . "

21. Minyen v. American Home Assurance Co., 443 F.2d 788 (1971, 10th C.C.A.).

mity which substantially contributes to death or injury, the death or injury is not within the coverage of a policy which insures against death or bodily injury by accidental means, direct and independent of other causes.

■ The United States District Court of the District of Columbia [22] had a similar problem, where a woman having a previous heart trouble history was denied recovery by her representatives under a commercial accident policy having a provision like that in the instant case, where in a 2½ hour rainstorm, having experienced exposure to it, worry and emotional upset and stress incident to it, she suffered some damage, the appellate court, speaking through Holtzoff, District Judge, agreed with us that:

> Looking at the testimony from the standpoint most favorable to the deceased, her heart condition became seriously aggravated, and if there was a physical injury to the heart at the time, it was caused as a result of the exposure to the storm, and the worry and emotional upset and stress and strain that accompanied this drive for two and a half hours through the rain storm. The Court is of the opinion that this was not an accident within the proper meaning of that term as used in this policy. It is

not a condition of a type that could have been contemplated by a policy of this kind.

> The Court is not unmindful of the fact that an insurance policy should be construed most favorably to the insured and against the insurance company, because the policy is drawn by the company. Nevertheless, the Court is unable to see, by any stretch of the imagination, how an injury acquired in the manner in which this injury occurred can be said to be accidental or resulting from an accident.

following which he said:

> An illuminating light is cast upon this question by the Supreme Court in Landress v. Phoenix Ins. Co., 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934, in which it was held that a sunstroke sustained by a golf player on the golf links does not constitute an accidental injury within the meaning of an accident insurance policy,

which has something to do, arguendo, with Richards v. Standard Accident Insurance Company,[23] a vintaged, sunstroke case, leaned upon by plaintiff, and one which apparently did not enchant the United States Supreme Court as far as sunstroke is concerned, in Landress v. Phoenix Mu-

---

22. Love v. Am. Cas. Co., 202 F.Supp. 47 (1961), not necessarily dispositive but cited for a general statement of the law on this subject.

23. 58 Utah 622, 200 P. 1017 (1921).

tual Insurance,[24] but which case we think to be consonant with our position here, when it recited under (3) of Browning v. Equitable Life,[25] a category that well might make considerable sense under the circumstances of the instant case, when it said there was no liability under a policy like that here,

> When at the time of the accident, there was an existing disease which, co-operating with the accident, resulted in the injury or death, the accident cannot be considered as the sole cause, or as the cause independent of all other causes.

The language in Mutual Benefit v. Hudman,[26] seems to bear us out a bit, in an accident policy case, where it was determined that there was no basis for recovery where the policy provided for coverage "independently of other causes," saying "the real question is whether the beneficiary must prove the accidental injury was a proximate cause or the sole proximate cause" and that "independently" means what it says: "solely," "only," "standing alone" "and that most American Courts are in accord with the views here expressed."

The only confusion here is the approach: 1) What does the contract say and 2) What do we want it to say? This is a case at law, not in equity, where fraud, mistake, undue influence and the like are attendant. The contract is clear. "Strictissimi juris" is a foreigner to it. Any suggested obfuscation in it is provable by him who suggests it who has the burden of proving the fact,—something absent here. There is nothing confounding in the language of the policy here illusionary or nebulous in discernibility. It is plain. It is clear. It has to do with an "accident" in the common adaptation of that term and nowhere in its language can be found the terms "stress" or "strain." [27]

The irony of this case is that it is based on stress and strain arising out of controversial cases,—just two of them. The business of a court and the judge thereof, in the nature of things, is to determine controversies. The job itself involves as its chief function the settlement of controversial subjects. That is the heart of the judge's right or duty, and to say that in a job where the prime function is to determine "controversies" is one where "controversy" is the basis for recovery under an accident policy is an "accident," is to lend a meaning to words that makes for unrealism.

This case is a tough one. The author of this decision was a teen-age friend of the

---

24. 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934 (1934).

25. 94 Utah 532, 72 P.2d 1060 (1937).

26. Tex., 398 S.W.2d 110 (1965).

27. 131 A.L.R. 240; Appleman, Insur.Law & Prac. 403.

decedent, has respected him and his family highly, and it is not easy to deny the fruits of an insurance policy to its beneficiaries, —but empathy cannot supplant sympathy for contractual principles and the use of words. (Emphasis supplied.)

CALLISTER, C. J., and FERDINAND ERICKSON, District Judge, concur.

ELLETT, J., concurs in the result.

CROCKETT, J., having disqualified himself, does not participate herein.

TUCKETT, Justice (dissenting):

I respectfully dissent. This is an action upon an insurance policy which policy defines the word "injury" in the following terms:

"Injury" wherever used in this certificate means bodily injury occurring while the Group Policy is in force as to the Insured Person or Insured Dependent whose injury is the basis of claim and causing the loss directly and independently of all other causes and effected solely through an accidental bodily injury to the Insured Person or Insured Dependent.

It should be noted that the policy we are here dealing with is unique in that it does not include the language usually found in policies insuring against injuries resulting from accident or accidental means. Most policies of this type define accident or accidental injury in language such as: bodily injury effected solely through external, violent and accidental means; bodily injuries effected directly and independently of all other causes through external, violent and accidental means. Then too, the policy does not contain language found in most policies of this type which exclude the loss which is contributed to or which results in whole or in part from bodily sickness or disease. As the record shows, Judge Leonard Elton was under considerable stress for several months prior to his death from a cerebral occlusion which occurred on May 13, 1970. The stress was occasioned by the judge's undertaking the responsibilities of presiding judge of the Third Judicial District and in the trial of several difficult cases which had attracted wide public interest and publicity. One of the physicians who testified on behalf of the plaintiff voiced the opinion that there was a reasonable medical certainty that the activities of the decedent during the last six weeks of his life and the stress he was under during that period aggravated his condition of arteriosclerosis which resulted in the cerebral occlusion. This occurrence was referred to in the medical testimony as a cerebral vascular accident.

The defendant adduced expert testimony which tended to show that Leonard Elton suffered from a chronic disease which tended to progress and which eventually affected the brain and resulted in death. The case was submitted to the jury and the jury was correctly instructed that the plaintiff was entitled to recover if the death of the insured resulted from accidental injuries and that death would not have occurred at that time except for those injuries. The court also instructed the jury that if a preponderance of the evidence showed that Leonard Elton was suffering from a cardiovascular disease and that at the time of his death he was under unusual mental stress and strain caused by an unusual amount of work, or work causing unusual mental stress and strain, and that the stress and strain aggravated the disease and proximately caused a cerebral thrombosis which proximately caused his death, then the plaintiff was entitled to recover. The court also instructed the jury that if the evidence showed that Leonard Elton prior to his death was suffering from arteriosclerosis or a heart condition, and that his death was brought about by the natural progression of that disease or condition, then the plaintiff was not entitled to recover even though the jury should find that the stress that he was under at the time of his death may have contributed to some extent to his death at that particular time.

I am of the view that there was a fact question in this case which the jury was entitled to consider and to decide. I would affirm the verdict of the jury and the judgment of the court upon the verdict.